## GREAT LAKES COAL & DOCK CO. v. SEITHER TRANSIT CO.

(Circuit Court of Appeals, Eighth Circuit. January 12, 1915.)

No. 4159.

1. SHIPPING ☜150—CARRIAGE OF GOODS—FREIGHT—PERSONS LIABLE.

Defendant, which as owner of a coal dock and as agent for the owner and shipper received for storage and forwarding a cargo of coal, receipting for the same on a shipping bill or memorandum presented by the master of the ship, which showed the cargo to be consigned to the shipper in care of defendant, did not have such interest in the coal as rendered it liable for the freight.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 511; Dec. Dig. ☜150.]

2. SHIPPING ☜150—CARRIAGE OF GOODS—FREIGHT—PERSONS LIABLE.

Where, in such case, the shipping bill did not disclose the rate of freight, but defendant had been advised by the owner of the intended shipment and requested to pay the freight thereon at a specified rate, which it did, being reimbursed therefor by the owner, the fact that the owner had subsequently agreed with the carrier to pay a higher rate did not charge defendant with liability for the excess, in the absence of an agreement by it to pay the same.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 511; Dec. Dig. ☜150.]

3. CUSTOMS AND USAGES ☜11, 17—SCOPE AND EFFECT—VARYING TERMS OF CONTRACT.

A custom or usage is only admissible to explain the terms of a contract when they are uncertain, equivocal, or obscure. It is not admissible to make a contract, or to controvert or vary the plain terms of a contract when one exists.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 22, 34; Dec. Dig. ☜11, 17.]

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Suit in admiralty by the Seither Transit Company against the Great Lakes Coal & Dock Company. Decree for libelant, and respondent appeals. Reversed.

H. A. Carmichael, of Duluth, Minn. (Washburn, Bailey & Mitchell and A. C. Gillette, all of Duluth, Minn., on the brief), for appellant.

H. R. Spencer, of Duluth, Minn. (Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, on the brief), for appellee.

Before HOOK and CARLAND, Circuit Judges, and REED, District Judge.

REED, District Judge. The Seither Transit Company, a corporation duly enrolled and licensed by the United States for the carriage of freight upon the Great Lakes and their connecting waters in the United States, sued the Great Lakes Coal & Dock Company in admiralty to recover a balance of some $2,450, with interest, alleged to be due it

upon a contract for the carriage of a cargo of coal weighing 6,108 tons and 700 pounds, from the port of Toledo, Ohio, to Superior, Wis., at the rate of 70 cents per ton. The libel alleges that the cargo was consigned to the Great Lakes Coal & Dock Company, and that it is liable to the Transit Company for the freight thereon at 70 cents per ton, of which it has paid only $1,832.40. It also alleges a special agreement of the defendant to pay to the Transit Company the 70-cent rate; also a general custom, known to the defendant, for receivers of cargoes of coal upon the Great Lakes to pay the freight charges thereon.

The defendant admits the delivery of the cargo at its dock in Superior, but claims that it received the same only as agent of the White Oak Coal Company, to whom it was consigned in care of the defendant; that it paid the freight thereon, amounting to $1,832.40, at the request of and as agent only of said White Oak Coal Company, and not otherwise, which amount that company repaid to it; and denies all other articles of the libel. The hearing resulted in a decree for the Transit Company for the amount claimed, and the defendant appeals.

The testimony shows without substantial dispute, that the appellant, which will be called the defendant, a Minnesota corporation, was in December, 1912, the owner of a dock upon Lake Superior, located at Superior, Wis., and there engaged in dealing in coal upon its own account and receiving consignments of coal from vessels navigating the Great Lakes for itself and others. About November 20, 1912, Mr. Becker, the manager of the boats of the Transit Company, made a verbal agreement with the L. C. Ayers Coal Company at Toledo, Ohio, as agent for the White Oak Coal Company, a corporation engaged in mining and shipping coal, for the shipment of a cargo of coal for the White Oak Coal Company from Toledo to Superior, Wis., in the steamer Grammer, a boat of the Transit Company, at 30 cents per ton. It was then contemplated that the cargo would be shipped before midnight November 30th, when insurance upon vessels navigating the Great Lakes would expire; and it was agreed that if the Transit Company paid additional insurance upon the vessel the Ayers Company would pay it. The boat was to be loaded as soon as it arrived at Toledo. It did arrive at that port about 6 o'clock in the afternoon of November 29th, but it was not loaded in time for the boat to clear for Superior until about noon of December 1st, for whose fault does not appear. When the boat was loaded a memorandum, made by the Railroad Company which brought the coal to the dock at Toledo, was delivered to the ship, reading as follows:

"Form 167.

"No. 634.   O. C. 109.                               Toledo, O., 12—1, 1912.

"Shipped in good order by W. O. C. Co., for account and risk of whom it may concern, on board the Grammer, whereof ...... is master, now lying in the port of Toledo, Ohio, and bound for Superior, the following articles, to be delivered in like good order at the port of destination (the dangers of navigation, fire, collisions, and breakage of canals only excepted) unto the consignee named in the margin or to ...... assigns.

"In witness whereof, the master of said vessel hath affirmed ...... bills of

lading of this tenor and date, one of which accomplished, the other to stand void.

.................................................................................
.................................................................................

"White Oak Coal Co.
    % Grt. Lakes C. & D. Co.
        "Superior, Wis.                                              6108 tons 700 lbs.
"Cargo Recd.
    "Great Lakes Coal & Dock Co.
        "W. Somershield, Supt.
"Other coal in hatches 1–3–8–10–12.

                                                                    "V. H. Palmer."

Who V. H. Palmer is does not appear. This memorandum, though not signed by either the C. L. Ayers Coal Company or the master of the vessel, was accepted by the master as a shipping bill of the coal. The master of the ship (Captain Burns) recognized the receipt thereon as the receipt given him for the cargo upon its delivery at the dock of the defendant company in Superior. After the boat cleared for Superior, another writing was prepared in the office of the C. L. Ayers Coal Company, of Toledo, reading as follows:

                        "The C. L. Ayers Coal Company,
                            "Coal and Coke.
                            "Cleveland, Ohio.

"No. 4.                                              Toledo, Ohio, Dec. 1st, 1912.
    "Shipped in good order and condition by the C. L. Ayers Coal Company, as agents and forwarders, for account and at the risk of whom it may concern, on board the str. Grammer whereof ...... is master, bound from this port for Superior, Wis., the following coal as here marked and described, to be delivered in like good order and condition as addressed on the margin, or to his or their assigns or consignees, upon paying the freight and charges as noted below (dangers of navigation, fire, and collision excepted). It is also agreed that the shipper shall be held blameless for any delay in discharging cargo.
        *       *       *       *       *       *       *       *       *       *
"Consignee and Destination                                          Description.
.................................................................................
"White Oak Coal Co.,
    "Superior, Wisconsin,
        "% Great Lakes Coal & Dock Co.                          6,108 tons 700 lbs.
                                                    "Freight 70 cents per ton,
                                                        free in and free out to
                                                        vessel.
                                                                "$4,275.85
                        "[Signed]    The C. L. Ayers Coal Co."

This bill was prepared in the office of the C. L. Ayers Company at Toledo some two or three days after the Grammer cleared that port for Superior. A clerk in that office testified:

    "That he had no recollection of handling this bill, and could not say that it or a copy thereof was mailed to the defendant, but that he knew of no reason why a copy should not have been mailed to it, as in other cases."

The Transit Company paid additional insurance upon the boat equal to about 40 cents a ton upon the coal, and this amount by agreement with the Ayers Company was added to the 30-cent rate agreed upon, and the rate of freight at 70 cents per ton was noted upon this bill after the Grammer left Toledo for Superior. No rate was specified

upon the first bill, upon which the defendant receipted for the coal, and neither that bill nor this bill of lading, so-called, was signed by the master or owner of the vessel.

The Grammer arrived at Superior about December 5th, and the cargo was delivered at the dock of the defendant, and its superintendent made the receipt shown upon the shipping bill first above mentioned. Nothing was then said about the freight by the master to the superintendent. The master testified as follows:

"Q. What did you do in regard to your freight?
"A. Why, I got a telegram from Mr. Becker saying for me to collect freight at 70 cents per ton and send him check for that amount. I tried to do so, but the superintendent said it was all right; we would get our freight; it would come from St. Paul. Nothing was said about the 70-cent rate at the time of the arriving; it might have been after we started to unload two or three hours; but before we were unloaded the matter of the 70-cent rate was up.
"Q. And he [the superintendent] agreed on behalf of his people to pay it, and said that the check would come from St. Paul?"
(Objected to as incompetent and no proper foundation laid. Objection overruled at the hearing.)
"A. Yes; said the check would come, and that it would be all right. I had carried coal in the Grammer before to the Great Lakes Coal & Dock Company under Mr. Becker's management; but I had not on those occasions taken up the matter of freight with the defendant."

Mr. Becker, the manager of the boat, was recalled, and testified that the Great Lakes Coal & Dock Company paid the freight on previous occasions.

"Q. And they paid you the freight on this cargo?
"A. Yes; part of it; whatever has been paid they paid. These previous cargoes were shipped by Mr. Ayers and consigned to the Great Lakes Coal & Dock Company. This cargo was consigned to the White Oak Coal Company, 'care of Great Lakes Coal & Dock Company.'"

The president, who was also manager of the defendant company, testified that about November 20, 1912, he was informed that the White Oak Coal Company was about to ship the defendant a cargo of coal from Toledo upon which the freight was to be 30 cents per ton; that defendant was requested by that company to pay that amount of freight upon receipt of the cargo; that shortly after its receipt the defendant paid the Transit Company 30 cents per ton upon the shipment, amounting to $1.832.40, which amount the White Oak Coal Company repaid to it; that if the defendant had paid more than that upon the cargo, the White Oak Coal Company would not have reimbursed it for the payment in excess of 30 cents per ton; that the C. L. Ayers Company was not the agent of the defendant for the shipment of this coal; that in receiving the cargo the defendant acted only for the White Oak Coal Company, with whom it had arrangements for the receipt and storage of coal consigned to it in care of the defendant at an agreed compensation. He also testified that cargoes of coal consigned to the defendant during the season of 1912, upon which it paid the freight for itself, belonged to the defendant; that cargoes consigned to the White Oak Coal Company or other companies in care of the defendant were not owned by the defendant, but were the property of the White Oak Coal Company or other

companies to whom they were consigned in care of the defendant; that when it paid the freight upon such consignments it was at the request of the White Oak Coal Company or other company owning the coal, and the amount so paid was reimbursed to the defendant by such other companies.

Mr. Somershield, the dock superintendent of the defendant at Superior, testified as follows:

"When Captain Burns of the steamer Grammer brought the cargo of coal to the dock of the defendant about December 5th, he asked me if the freight was to be paid at Superior. I told him, 'No; I had nothing to do with that; that was to be taken care of at Minneapolis.' He never said anything to me about the rate of freight, whether it was 30 cents or 70 cents per ton."

[1, 2] Upon these facts, may the Transit Company recover from the defendant the unpaid charges upon this shipment of coal?

It is undisputed that the White Oak Coal Company was the owner of this cargo of coal when it was shipped from Toledo and when it arrived at its destination in Superior, and that defendant had no interest in the transaction other than to receive the coal for that company, pay the freight thereon at the rate of 30 cents per ton, and hold it for the White Oak Coal Company. The first bill, upon which the defendant's superintendent receipted for the cargo, manifestly does not bind the defendant by its acceptance of the coal to pay the freight thereon at any particular rate, for none is specified upon that bill. The second bill was not made until two or three days after the vessel carrying the cargo left Toledo for Superior. When it was mailed to the defendant, if at all, does not appear. It was not signed by the master of the vessel, and if accepted by the manager of the Transit Company it is binding only between that company and the Ayers Coal Company, and not upon the defendant, unless it has in some manner agreed to its terms. If the defendant can be regarded as a consignee at all of this coal under this bill, it is only as agent of the White Oak Coal Company, who upon the face of the bill is the consignee, and the defendant but the caretaker or agent of the consignee. Upon such a consignment the caretaker or agent acquires no interest in the goods, except to receive them and deliver or account for them to the owner. Grove v. Brien, 8 How. 429, 12 L. Ed. 1142; Dart v. Ensign, 47 N. Y. 619; Hutchinson on Carriers, Sec. 450.

In Grove v. Brien, 8 How. 429, 12 L. Ed. 1142, the facts were that Brien, being the owner of a quantity of nails and indebted to Grove, Gilmore, and William Fowle & Sons, shipped the nails by boat under a receipt from the master and owner thereof as follows:

"Received of John McP. Brien 500 kegs of nails, to be delivered to William Fowle & Sons, Alexandria, D. C., for the use of Robert Gilmore, Baltimore, in good order."

And on the same day he sent a letter, directed to Fowle & Sons, advising them that the nails were consigned to them for the use of Gilmore, which was received about the time of the arrival of the consignment. Grove attached the goods in the hands of Fowle & Sons to secure the debt owing him by Brien, and Fowle & Sons claimed a

lien upon the nails on account of prior advances to Brien. Of this transaction the court said:

"The effect of a consignment of goods, generally, is to vest the property in the consignee; but if the bill of lading is special, to deliver the goods to A. for the use of B., the property vests in B. * * * If the person to whom the goods are ordered to be delivered is only an agent of the shipper, he has no property in them, and cannot maintain an action against the master for not delivering them."

True, only the question of the ownership of the nails under the facts stated was involved in that case; but it is declared to be the law that if the bill of lading is special—that is, upon its face, that the goods are to be delivered to one for the benefit of another—the one to whom the goods are to be delivered acquires no interest therein except as agent of the other, to whom he must account for them. In Hutchinson on Carriers the rule is concisely stated as follows:

"Sec. 450. The presumption that the consignee is owner of the goods may be rebutted, and a different relation may be shown to exist; and if he be the mere agent of the shipper, or of a third person, and this fact is known to the carrier, or is shown by the bill of lading, no contract will be implied on the part of the consignee to pay the freight, although he does not inform the carrier that he receives the goods as agent. But the consignor, if owner of the goods, will remain solely liable. Accordingly, if goods are consigned to the care of one person, for another for whom they are intended, the former does not become liable for the freight, although he may receive them, because he acts merely as the agent of the latter, and the only promise which can be inferred from their receipt under such direction given in the bill of lading or otherwise is prima facie a promise as agent only to pay the freight on account of the principal, and not to be personally responsible for it. The effect of such special consignment is to vest the title to the goods in the person for whom they are sent, and the action for any loss or damage must be brought in his name, and the consignee for care is merely his agent. Nor does a mere intermediate consignee, to whose care the goods are consigned for further transportation to the ultimate consignee for whom they are intended, the facts being known to the carrier or shown by his bill of lading or receipt, become liable by receiving the goods as a mere forwarder. But in such cases the consignor, or consignee at destination, as the one or the other may be the owner, becomes liable to the carrier."

When the principal in a transaction is disclosed, and an agent is shown, or is known to be acting as such for a known principal, the agent is not liable in the transaction unless he has especially agreed to become so. Whitney v. Wyman, 101 U. S. 392–396, 25 L. Ed. 1050; Metcalf v. Williams, 104 U. S. 93, 97, 26 L. Ed. 665; Post v. Pearson, 108 U. S. 418, 422, 2 Sup. Ct. 799, 27 L. Ed. 774; Dart v. Ensign, 47 N. Y. 619; Thilmany v. Iowa Paper Co., 108 Iowa, 357, 360, 361, 79 N. W. 261, 75 Am. St. Rep. 259; Blanchard v. Page, 8 Gray (Mass.) 281–292; Boston & Maine R. R. Co. v. Whitcher, 1 Allen (Mass.) 497.

In the case before us the bill of lading shows upon its face that the defendant was but a caretaker or agent of the White Oak Coal Company to receive the coal; and the evidence shows that it was to pay the freight thereon at the rate of 30 cents per ton and store it for said company. The defendant is not, therefore, liable for the freight in excess of that amount, unless it has agreed with the Transit Company to pay the greater rate. The Transit Company recognized the

correctness of this rule by alleging, and attempting to show, an express agreement of the defendant by its dock superintendent to pay the 70-cent rate on this shipment. It was, therefore, incumbent upon it to prove the authority of the defendant's dock superintendent to bind the defendant by such agreement. There is an entire absence of proof of such authority. But it is said the Transit Company waived its lien upon the coal for the carriage when it surrendered it to the defendant, and for this reason the defendant should be held for the 70-cent rate. The libel, however, is not drafted upon the theory of an estoppel, but upon an alleged civil contract or agreement of the defendant to pay the freight upon the cargo at the rate of 70 cents per ton. If it had been drawn upon the ground of an estoppel, there is no evidence to sustain it upon that ground. The master of the vessel knew "days before the ship was unloaded" that the dock superintendent was not to pay the freight at any rate. If the master desired to retain the ship's lien upon the cargo, he should have stopped the unloading of the vessel until the payment of the freight and the amount thereof was settled, which he failed to do. The defendant is not, therefore, responsible for his waiving the lien by permitting the coal to be unloaded.

We discover nothing in Empire Transportation Co. et al. v. Philadelphia & Reading Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623, cited by appellee, bearing upon the questions involved in this case.

Union Pacific Ry. Co. v. American Smelting & Refining Co., 202 Fed. 720, 121 C. C. A. 182, decided by this court, was an action by the Railway Company to recover the unpaid portion of freight upon a quantity of ore shipped by rail from some place in Nevada to the Smelting Company in Denver and there delivered to it. The rate of freight fixed in the published schedules of the Railway Company for such shipment was $7,549.70, and only about $4,600 was paid thereon—for what reason does not appear. The action was to recover from the Smelting Company the difference; and to a complaint alleging these facts a demurrer was sustained, and judgment rendered for the defendant. The judgment was reversed, upon the ground, mainly, that the act to regulate commerce forbade the carrier to charge or receive from any person or corporation, for the carriage of property over its lines in interstate commerce, any greater or less or other rate for carrying such property than that fixed by the schedule of rates filed with the Interstate Commerce Commission. As the amount accepted by the carrier from the Smelting Company upon this shipment of ore was less than the schedule rate, it was a violation of the act to regulate commerce, and the duty of the Railway Company to sue for and recover, from the person or corporation to whom it charged the lesser rate, the difference. See Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011.

The American Smelting Company was apparently the owner of the ore; but, whether so or not, a lesser rate for the carriage of the property was accepted from it for the carriage than the schedule rate. The Smelting Company was not a mere caretaker of the ore,

or agent for the owner thereof, and what is said in the opinion must be limited to the facts and the question involved in the case. Other cases cited by appellee are clearly distinguishable upon their facts from this, and need not be reviewed.

[3] The alleged custom relied upon by the Transit Company does not help it. A custom or usage is only admissible to explain the terms of a contract when they are uncertain, equivocal, or obscure. They are not admissible to make a contract, or to controvert or vary the plain terms of a contract when one exists. Thompson v. Riggs, 5 Wall. 663, 679, 18 L. Ed. 704; First National Bank v. Burkhardt, 100 U. S. 686, 692, 25 L. Ed. 766; Savings Bank v. Ward, 100 U. S. 195, 206, 25 L. Ed. 621.

The decree is reversed, and the cause remanded to the District Court, with directions to dismiss the libel at the costs of the appellee. Reversed.