## In re TIDEWATER COAL EXCH.

### Ex parte DAVIS, Director General.

(District Court, S. D. New York. August 3, 1923.)

1. Exchanges ⬅⟹9—Rule that earlier payments are credited against earlier debits applied to withdrawals from pool by members.

Where shippers of bituminous coal organized an association to facilitate shipments to tidewater through pooling of the coal, with debit and credit charges for coal deposited and withdrawn, withdrawals by each member not being limited to his deposit, and each pool being independent of others. *held* that, under the rule of accounts that earlier payments are to be credited against earlier debits, the withdrawals by a railroad should first be credited against its existing credits on March 1, 1920, when the

railroad was redelivered to its owners under Federal Transportation Act, § 200, before its deposits were applied.

**2. Railroads ⊜⟶5½, New, vol. 6A Key-No. Series—Director General of Railroads held entitled to claim against Coal Exchange for coal withdrawn, not represented by coal on hand, less debits of that day.**

Where a railroad was a member of an association of shippers of bituminous coal organized to speed up shipments of coal to tidewater by a pooling of the coal shipped, each member being credited with the coal deposited and debited with coal withdrawn, members in withdrawing not being limited to the amount of coal deposited, each pool being independent of the others, and each overdrawing member being required to replace in kind his withdrawal, *held*, that on the redelivery of the railroad to its owners under Transportation Act, § 200, the railroad under the terms of its contract with the Director General made under Federal Control Act, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾a), providing that the Director General on redelivery of the railroad should return material and supplies equal in quantity and quality to those received, etc., was chargeable only with coal which it had actually withdrawn from the pools before March 1, 1920, and the Director General could claim as not transferred to the railroad only so much of the coal credits as were not represented by coal on hand in the pools less the debits on that day.

**3. Evidence ⊜⟶456—Of circumstances surrounding execution of a written agreement admissible to show words not used in normal meaning.**

Though it is true that the language of a written agreement, if clear, cannot be varied by proof of the private intentions of the parties, the court may always receive evidence of facts surrounding its execution, and, if it plainly appears that the parties meant the words to be used out of their normal meaning, the intention of the parties controls.

**4. Exchanges ⊜⟶12—Agreement by shippers' association to pay demurrage held to be made on behalf of shippers and not binding on association.**

An agreement by an association of shippers organized to facilitate shipment of coal to tidewater by pooling the coal, which had no assets, to "make prompt payment of all demurrage charges," *held*, in view of the surrounding circumstances and the practice of the association, to be intended by all parties thereto to mean that the association should make payment through its members and shippers, and it did not become binding on the association, and the Director General of Railroads who was a privy to the agreement was not, under such agreement, a direct creditor of the bankrupt association.

**5. Carriers ⊜⟶100(1)—Association receiving shipments as agent for members held not liable for demurrage.**

Though consignee is liable for freight and demurrage regardless of knowledge of the amount thereof, an association of coal shippers organized to facilitate shipment of coal to tidewater, and which received the coal as agent for shippers and owners, was not liable for demurrage, though the form of bill of lading named it as consignee for shippers' account, the carriers having knowledge of the relationship of the association to its members.

In Bankruptcy. In the matter of the Tidewater Coal Exchange. Petitions by the Director General, James C. Davis, and by the trustee in bankruptcy to review an order of the referee in bankruptcy in part allowing and in part rejecting a preferred claim in favor of the Director General. Petitions granted in part, and denied in part.

See, also, 274 Fed. 1008, 1011.

James F. Curtis, of New York City (Root, Clark, Buckner & Howland, of New York City, on the brief), for trustee in bankruptcy.

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Evan Shelby and John E. Walker, both of New York City, for Director General.

LEARNED HAND, District Judge. The question is in two parts: First, whether the Director General has a claim for coal delivered to the pool on account of the New York, New Haven & Hartford Railroad Company, as that account stood on March 1, 1920; second, whether the Director General is a direct creditor of the bankrupt under the demurrage agreements signed by it in August, 1917, with the several tidewater railroads. The referee disallowed the first claim and allowed the second.

### The Claim for Coal Credits.

This claim turns upon whether at the termination of federal control on February 29, 1920, the rights of the Director General as operating agent for the New York, New Haven & Hartford Railroad passed to that road, or whether they were retained by him. The nature of these rights has now been conclusively established, and at the time in question it was as follows: Each shipper or consignee was a co-owner with all others similarly situated of the coal at any time actually within any particular pool. The fact that it was on wheels is irrelevant; the situation was the same as though all the coal of that pool were in one bin. But this accounted for only the coal actually in a pool. Pools might be, and usually were, overdrawn, and as to this part of their coal the shippers could not be co-owners. Each overdrawn member owed to the other members of that pool collectively the amount of coal which he had severally overdrawn. Therefore the shippers, who were not overdrawn, had joint claims, i. e., choses in action, against each overdrawn member, requiring him to replace in kind his withdrawals from that pool. All the claims were independent of each other; "the account of a member in one designated pool shall not have any bearing on his account in another pool." Rule 23 (old rule 12). Therefore on February 29, 1920, the Director General was part owner in the various pools and one of the co-obligees against each overdrawn member in those pools, the obligation being to restore in kind. How far the pools were overdrawn in which he was a member does not appear. This was not a money asset of the Director General but part of his supplies as operator of the New Haven Railroad. The question whether it was assigned is to be governed precisely as though it were in part coal in bins along the road and in part a claim for coal which had already been paid for, but not yet delivered.

The redelivery of the roads was already contemplated in the Federal Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), of which section 1 provided that an agreement might be made with the Director General for the operation of any road. Among other details, this section provided that such agreements should provide for accountings and adjustments "of charges and payments" so "that the property of each carrier" might be returned "in substantially as good repair and in substantially as good equipment" as when taken over. Such a contract was made in the case of the New Haven Road, which in section 9 (b) provided that the Director Gen-

eral should return materials and supplies equal in quantity and quality to those he had received, but if the quantities were more or less than what the Director General had received, the parties should appropriately account to each other in cash for the balances. The whole mechanics of the final redelivery should be understood with this basic provision in mind.

Section 200 of the Transportation Act (41 Stat. 457) barely directs redelivery as of March 1, 1920; the Proclamation of the President (41 Stat. 1788) adds nothing of any consequence. The transfer is to be judged by the original contract and the methods adopted in its execution, especially by general orders 62, 62-a, and 66 of the Director General himself. Under general orders 62 and 62-a, inventories were to be taken, corrected down to March 1, 1920, "of all new, secondhand, and scrap materials and supplies received and on hand, whether in material stock, or charged out to any other accounts." These inventories were intended to serve as the basis for the redelivery and accounting prescribed in the original contract made in accordance with section 1 of the Federal Control Act.

General order 66 contains the detailed directions by which the account was to be stated. It is very long and complicated and addressed to railway accountants so as to be difficult to understand. So far as this case goes, only article 4 of it is of any moment, since that alone relates to materials and supplies. It says nothing of the disposition of materials and supplies on hand, any more than does general order 62, or section 200 of the Transportation Act. However, it presupposes a delivery of all supplies, because it directs how the account shall be stated in respect of them. Since the Director General was going out of the railroad business, he did not want to remain in possession of railroad supplies. This implicit understanding probably accounts for the absence of any express mention of a transfer.

Article 4 of general order 66 is founded upon the inventories which were directed to be taken under general orders 62 and 62-a. It divided the materials and supplies into four classes: (a) Those received and paid for before March 1st; (b) those received before and paid for later; (c) those paid for before and received later; (d) those received and paid for after, but ordered before. The coal actually in the pools was not in either of classes (a) or (b), but in subdivision (c), because although the Director General was a part owner in it, yet according to the practice any other part owner could have drawn down his whole credit, not leaving enough for the credits of the others, unless the overdrawn members restored their overdrafts. This ownership was therefore subject to defeat by others similarly situated, and it is not true that the coal in the pools was equivalent to coal in the bins of the railroad itself. I shall, however, have more to say of this later.

The claims against overdrawn members clearly fall within subdivision (c) as well. These, as I have said, are not money claims but obligations to restore coal to the pools. It makes not the slightest difference whether they arise through the payment by the Director General of sums of money, i. e. whether they were purchases of coal in the market, or whether through permission to withdraw coal which

had been the property of the pools in which the Director General was a co-owner. In short, the consideration for the claim is irrelevant; what counts is its nature. Thus the claims arising from withdrawals in these pools are properly "amounts paid prior to March 1, 1920, for materials and supplies not received at midnight February 29, 1920."

The account was treated as a single entity, and as such a "deferred asset" on the books of the road, and there was justification in so doing. Until the coal was "received" when the road withdrew it from the pools, it was not charged with it, and the Director General remained on the books the owner of the claim. As soon as it did, the road became charged. The road withdrew about 53,000 tons of coal and deposited about 37,000 between March 1 and April 30, 1920. If I disregard any separation of the pools and lump them all in one, and if the withdrawals are charged first against the deposits, there remained about 7,000 tons which it never received. On any theory whatever this must be the limit of the Director General's claim.

[1] However, there is no warrant for charging the withdrawals against the deposits. The account was by hypothesis transferred as a whole, and the road started with a "credit" of a little less than 23,000 tons partly in coal, partly in claims against comembers. It is the usual rule in accounts that earlier payments are to be credited against earlier debits. Clayton's Case, 1 Mer. 572; U. S. v. Kirkpatrick, 9 Wheat. 720, 738, 6 L. Ed. 199; In re Hawks (D. C.) 204 Fed. 309, 315; Grant v. Fletcher (D. C.) 283 Fed. 243, 271. The analogy applies to the case at bar. The pools may be regarded as owing coal to their several members, and any withdrawals should be first debited against the existing credits transferred on March 1, 1920, before the deposits are applied. If so, they exhausted the total of credits and much more. On this theory, which is the only proper one if the account is to be treated as a whole, the road "received" in materials and supplies all the account and there was no "deferred asset" on April 30, 1920. The Director General had no claim left whatever.

All the foregoing is on the assumption that the account was transferred as a whole. I think that this must have been intended, in spite of the fact that as between the Exchange and its members each pool was treated separately under rule 23 (old rule 12). My reason for so thinking is that otherwise the Director General would have remained liable in respect of the eight pools in which he stood overdrawn on February 28, 1920, as appears from trustee's Exhibit 3 of July 17, 1920. This was certainly not the intention of the parties. The Director General was retiring from the operation of the railroads and with it from the coal business. Yet these overdrafts were not to be liquidated in money, but in coal. It appears to me clearly impossible to suppose that he meant to make them good. Yet it is equally clear that if the pools be treated separately, he did not transfer the debits, for they were not materials and supplies but obligations. The parties certainly meant to take over the account as a whole.

[2] Unhappily not all the difficulties are answered even if they did, because while I agree that withdrawals are to be charged in a given

pool to credits in that pool, I cannot agree that withdrawals in one pool may be charged aaginst credits in another. It is therefore necessary in ascertaining whether any of the credits remained "deferred assets" on April 30, 1920, to consider the pools separately. It so happens that the withdrawals from all the pools, considered separately, exhausted the credits in those pools with the exception of the five stated below.[1] Hence it may be argued that in respect of the credits remaining in those pools on April 30, 1920, the assets were still "deferred" and could not be charged to the road. If so, the claim in liquidation for these balances was the property of the Director General.

Yet it would not be right to allow him for all the credits in these pools. Presumably there was some coal in each of them when the Exchange closed down. To the extent that there was, the road was a co-owner of that coal and it was materials "received" since it was clearly on hand. The road would therefore be forced to submit to a charge for this coal, and the Director General could claim against the Exchange only so much of these credits as on April 30, 1920, was not answered by coal on hand in those pools. Moreover, against any such claim of the road not to be charged the Director General could offset the debits of the road on April 30, 1920, because by hypothesis the account was transferred as a whole, and the road was responsible for its debits even if it could charge back the coal which remained as a "deferred asset." Thus the balance chargeable back and so remaining a claim which the Director General can now assert as never transferred would be so much of the several residual credits in these five pools as were not represented in coal on April 30, 1920, less the debits on that day.

That would be the proper result except for one circumstance as to which I must own that I am in some doubt. It is altogether probable that in the five pools mentioned there was between March 1 and April 30, 1920, enough coal at some time to answer the credits of the road then outstanding. If so, should the road claim that it had never received these credits in coal, it appears to me that the Director General would have an answer. He could urge that the right to withdraw from a pool was not limited to the proportion of the credit of a single member which the coal on hand bore to the total credits in that pool. On the contrary, it rested with the road to exercise its right to withdraw all its credit at any time. If it chose, out of consideration for the Exchange or for any other reason, to refrain and to leave the coal on hand to be withdrawn by others, that was at its own option and could not be charged against him. He could further argue that the case was not covered by subdivision (c) because that referred to

| [1]Pool | Tonnage |
|---|---|
| S. Amboy 40 | 25.10 |
| Pt. Reading 44 | 2331.16 |
| Arlington 9 | 161.18 |
| Arlington 38 | 691.08 |
| Curtis Bay 34 | 20 |
| | 3228.52 |

materials which it was not within the power of the road to reduce to possession, e. g., materials bought of a seller who would not deliver. Since, on the other hand, the road was free at some time to take out its full credit in coal, it hardly lay in its mouth to charge him back with an asset which it merely declined to take over.

After some hesitation I am disposed to reject this argument. While it is true that the railroad might have withdrawn all its credits during the period in question, it was pretty clearly the intention of the parties that the transfer of the account should not result in changing the former practice of the Director General while operating the road. The understanding was, I think, that the road should continue to supply its needs in the usual course of its business and that withdrawals should be charged when received. To require of the road that it should change this course and hasten to clear its credits would be to impose on it a duty which as a loyal member of the Exchange it ought not to have been required to do. The honester interpretation of the transaction is to allow the road to charge back coal which it never did receive, even though it could have taken it all before April 30, 1920.

The Director General's petition to review is therefore granted to the extent indicated and the claim allowed.

### The Demurrage Claim.

In approaching this claim it is necessary always to bear in mind what would have been the result had all the members fulfilled their obligations. The coal accounts of each member or shipper who was not a member would have come out exactly in balance. There would have been no coal left in any pool and no shipper or consignee would have lacked a ton. Again it must be remembered that had this happened the Exchange would and could have had no assets whatever. The coal in each pool was not its property, but was owned by the shippers and consignees of that pool jointly. Nor were claims to restoration the property of the Exchange, but of the cotenants. For this reason the railroads had to pay the expenses of operation, which would otherwise not have been paid at all. Unless some shippers defaulted, and even then not until the Exchange adopted its curious method of liquidation, it was a mere association for stating the accounts of shippers between themselves and of furthering their purpose of classifying and distributing their property without keeping it separately earmarked.

It must be at once apparent to any one that nobody could have supposed that such an organization meant to undertake the payment of the demurrage charges of the shippers. To do so some means must have been provided for a fund out of which these could be paid. Such provision was in fact made so far as it was apparent that communal charges would be necessary, because the tidewater carriers agreed to defray all running expenses and loyally adhered to their bargain. Even if these might have been allocated and assessed individually among the members, which is extremely doubtful, the point I wish to make is that when the parties had in mind expenses which were not to be so collected, they expressly provided a fund to meet them.

Again, even in the only contingency—that which actually has arisen —in which the Exchange could have assets, the result would be a parody upon any intention which the parties could have entertained. The only present assets are the proceeds of that coal which overdrawn shippers ought to have restored, coal which on restoration would have immediately vested in those who were co-owners in the pools. The Director General should not seize all the proceeds of that coal, compelling the "creditor" members alone to bear the demurrage which on any theory whatever should have been ratably allocated among those who had incurred it. It cannot have been the purpose of the machinery of liquidation so to subject the assets belonging to the "creditor" members to these liabilities. If so, those will pay the demurrage who alone did not hasten to withdraw all their coal.

[3, 4] To all of the arrangements the railroads were privy. They had a representative on the committee and had aided in creating, as they continued to assist the continuance of, the Exchange as a whole. The Director General's case must rest therefore solely upon the language of the agreements executed in August, 1917, together with any legal duties of similar purport imposed by statute. It is quite true that each of these agreements contains an unconditional promise to "make prompt payment of all demurrage charges" arising under "the average basis" settlement allowed by the Interstate Commerce. Commission. The strength of his claim depends upon the actual words used, which considered only on their face appear to leave no opportunity of escape. Do not the legal obligations of the parties inevitably follow from the apparent meaning of these written words? It is indeed easy to see why the learned referee felt himself bound so to rule.

Nevertheless, it is always necessary to know what conduct the parties had in mind when they used the words chosen for the promise. Nor is there any limitation whatever on the right of a court to hear any facts which will throw light on what that conduct was. Wigmore, § 2470. It is indeed said at times that if the meaning of the language is clear, no proof is permissible to twist it from its usual sense. But that only means, as I understand it, that the words may be too clear to yield to the implications of any setting. It never means to preclude the comparison between the usual meaning of the words and their result under the circumstances. In short, the question is never of the proper use of language, but of what future conduct the specific promise actually contemplated. If it once plainly appear that the parties must have meant to use words out of their normal meaning, that will be the measure of the promise. All that can be said is that as matter of proof a court should be slow to assume that they did not use their words normally. There is, however, no rule of law which controls the admission of evidence of the surrounding facts, or the use which a court shall make of it, as there is, for example, touching contemporaneous declarations of intention. The ancient statements of the books that a document must be read within its four corners is no longer the law and has not been for a century. Words must always be translated into things or conduct, and they cannot be unless the setting is in proof in which they are used. This rule is wholly con-

sistent with that which excludes evidence of the private intention of the parties. While it is true that a court does not allow such intentions to prevail, but substitutes the sense in which ordinary persons would have used them, it can create and impute that sense to the words only after it has learned all the attending circumstances in which they were uttered.

I am free therefore to read this language as referring to that conduct which the parties must have intended, regardless of its correspondence with the common use of the words chosen. What is it most probable they understood, or, more strictly, what would ordinary men similarly situated have understood, when the Exchange promised that it "will make prompt payment of all demurrage charges accruing" under the carriers' tariffs? I believe that they understood that the Exchange should make payment only through its members and shippers.

I have already shown that the Exchange could not have been expected to pay because it had no funds. It is clear that the members were in fact expected to pay severally before the Exchange was to pay. This follows from rule 30 (old rule 10), which, after providing that the Exchange should sign the demurrage agreements and allocate the demurrage severally to the members, concludes that the Commissioner "will collect from each member * * * his proportion * * * and pay each carrier the amount due." To this rule the Director General was a privy and it was followed exactly in practice. The Director General billed the Exchange the total average demurrage; the Commissioner allocated it and collected, so far as he could, from the members. They at the outset sent him checks to his order which he invariably indorsed to the railroad, and later checks to the order of the railroads which he transmitted. In some cases they sent their checks direct to the railroads.

This practice continued throughout the whole period without any suggestion of any claim against the Exchange except for one instance which resulted in a repudiation of any liability by the Exchange, in which the Director General apparently acquiesced. This was in August, 1919, about eight months after any demurrage began to arise. At a joint meeting of the Exchange and the railroad committee they considered a demand by one federal treasurer that the Exchange give a bond for demurrage and make prompt payment of the demurrage. The meeting resolved to refuse the bond and to advise the railroad that the agreement contemplated collection from delinquent members, which was a matter for the railroads to effect. This was done and there the matter rested, the Director General taking bonds from the members in default and bringing 58 suits to collect.

Kinter says that this position was taken only because it was the convenient way, and that nobody doubted the liability of the Exchange. Whether his recollection is correct or not, which is at best very doubtful, the fact remains that the demand was made and refused and that the Director General never pressed the claim. No one else suggested it until one Finerty, a lawyer, presented it long after the Exchange had closed down.

From the outset each member had been compelled to contract directly with the carriers to pay his allocated share of the demurrage, and it was on this that the suits depended. It is at least doubtful whether the Exchange had itself any means of compelling payments. These contracts were not available to it, and there is nothing in the rules except some language in rule 10 (old rule 1), which can be thought to countenance a direct obligation. The plan laid out seems certainly to contemplate that the Exchange should be, what it was organized for, merely an agency of the members to get the advantages· of collective action in the carriage and despatch of their own property.

Judged, therefore, not only from the necessary facts of the situation at its outset, but from the practice which was uniform throughout the dealings of the Exchange, it seems to me that the words in the agreement on which the claim rests must be understood in the sense that I have read them. It would work a confusion of the whole scheme to impute to them any such meaning as this belated ingenuity of counsel now seeks to impose upon them; in addition, it would result in a grotesque injustice.

[5] However, it is argued that the parties were not free to make such a contract as this; that the law imposed upon the consignee of any property shipped the duty to pay such charges as these, and their contract, if it sought to avoid that result, was illegal. It is indeed settled that the consignee of goods shipped by a carrier becomes liable for the ·freights established in its tariffs, regardless of his knowledge of. their amount, or of any agreement between the parties. Pitts., etc.,. Co. v. Fink, 250 U. S. 577, 40 Sup. Ct. 27, 63 L. Ed. 1151; New York Central R. R. v. York & Whitney Co., 256 U. S. 406, 41 Sup. Ct. 509, 65 L. Ed. 1016. And if this were no more than a straight consignment of coal to the Exchange as consignee, the same rule would necessarily apply to demurrage· charges. But those cases do not touch the question whether the consignee who is known not to be the owner is liable for such charges. It was indeed held in Pennsylvania R. R. Co. v. Titus, 216 N. Y. 17, 109 N. E. 857, L. R. A. 1916E, 1127, Ann. Cas. 1917C, 862, and must be accepted as the law, that a consignee as such under a straight bill of lading is liable; but the language used in that case is significant of the limitations upon the doctrine. There the initial carrier who gave the bill of lading did not know that the consignee was only a factor of the shipper. For this reason he was treated as presumptive owner and compelled to pay; but it was clearly recognized arguendo that in case it had appeared that he was only an agent, the ordinary rules of liability would apply and that the principal alone would have been liable. This was expressly held by the Circuit Court of Appeals for the.Eighth Circuit in Great Lakes, etc., Co. v. Seither Transit Co., 220 Fed. 28, 136 C. C. A. 110, where the bill of lading showed the owner as consignee and the goods were shipped only in the care of the defendant. The same was true of Miner v. Norwich, etc., R. R., 32 Conn. 91, where the shipment was to ıthe ҫonsignee, "account of James P. Sabin." In Amos v. Temperly, 8 M. & W. 798, the same was held of freight where the goods were consigned "ᶜto the defendant for the London Gas Company or his assignees."

Rule 15 (old rule 2), provided that all shipping instructions and waybills should show for whose account the coal was shipped. The document was to read, "Tidewater Coal Exchange, Pool 25, account of John Doe Company," and this, as I understand, was the uniform practice. That was almost the very form before the court in Miner v. Norwich, etc., R. R. Co., supra; it showed who was the real consignee of the coal, and in the absence of an agreement to the contrary, made liable only the person so declared.

However, it is not necessary to rely on the mere form of the waybill or instructions. While the law does not allow any diminution by agreement of the charges as fixed in the tariffs, it nowhere attempts to fix liability on the consignee merely because he is named in the documents. The person liable, though not the measure of the liability, is to be ascertained by the ordinary rules of common law. The form of the bill of lading is important only because it is ordinarily the only source of information to the carrier of the person who by acceptance of the goods undertakes to pay the charges. In the case at bar the relations of the Exchange to its members were known intimately by all the carriers, and if these made the Exchange only an agency for the collection of the demurrage without any individual liability, they knew that as well as the members themselves. Therefore, even though the waybills had not read as the rule required, it would have been unimportant. If I am right in my understanding of the demurrage contracts, there never was any such undertaking by the Exchange, and without such or some estoppel which amounted to as much, the liability was on the members for whose benefit the agreement was made.

The petition of the trustee is granted, the order is reversed, and the claim expunged.