HOYLAND FLOUR MILLS COMPANY, APPELLANT, v. MISSOURI PACIFIC RAILROAD COMPANY ET AL., RESPONDENTS.[*]

Kansas City Court of Appeals. June 6, 1927.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2816, p. 833, n. 57; p. 834, n. 63; section 2887, p. 916, n. 31; Carriers, 10CJ, section 342, p. 241, n. 54; section 395, p. 276, n. 5; Courts, 15CJ, section 318, p. 934, n. 89.

*Morrison, Nugent, Wylder & Berger* for appellant.

*R. H. Beeson, Hackney & Welch* for respondent, Missouri Pacific Railroad Company.

*Follanbee, Shorey & Schupp* and *Lathrop, Morrow, Fox & Moore* for respondent, Erie Railroad Company.

BLAND, J.—This is a suit for damages alleged to have been caused plaintiff by reason of defendant's failure to deliver at New York City two carloads of flour shipped in sacks by it from Kansas City, Missouri, to former place. The petition was in two counts, each covering one of the cars. There was a verdict and judgment in favor of plaintiff in the sum of $2551.15 on each count. The court sustained defendant's motion for a new trial on the ground that the verdict of the jury was against the weight of the evidence. Plaintiff has appealed.

The facts show that the cars of flour were billed on October 14 and 15, 1921, respectively, by shippers order bills of lading containing substantially the same language. They read in part, as follows:

"Consigned to order of Hoyland Flour Mills Company Destination—New York City, for Export, State of New York . . . Notify—Metropolitan Flour Mill & Grain Co., 330-32 Produce Exchange, at New York City, for Export, State of New York . . . Route MP TSTL&W ERIE RR NEW YORK HARBOR—For Lighterage free for export . . . Allow Inspection by New York Produce Exchange Inspection Department Erie R. R. New York Harbor for Lighterage free for export."

Under these bills of lading the flour could be sold for domestic purposes upon its arrival in New York or be diverted to some other point or loaded on board ship for exportation to a foreign port. If this last occurred, the consignor was required to pay the difference between the domestic and export rate for transportation of the flour from Kansas City to New York, the domestic rate being a higher rate. It seems that it was the custom of plaintiff to ship flour to New York in this way and to decide after its arrival in New York as to what disposition it desired to make of the flour, the flour usually being sold through the Metropolitan Flour Mill & Grain Company, plaintiff's broker in New York City. Plaintiff would draw upon this concern for the value of the flour and attach the draft to the bill of lading to be taken up by the latter when the flour was sold. Plaintiff would notify its broker when the flour was shipped, sending a copy of the bill of lading so that the broker would know that the shipment was on its way.

The cars of flour in question arrived at Croxton, New Jersey, on October 26 and October 28, 1921, respectively. At Croxton was located the breaking up yards of the Erie Railroad; Croxton was three to five miles inland from Weehawken, New Jersey, at which latter point the terminal piers and docks of the Erie Railroad were located. Weehawken is situated upon the west bank of the Hudson River, opposite Manhattan. There is a high ridge of land between Weehawken and Croxton which latter point is situated near the Hackinsack River and west of the former. The yards of the Erie Railroad at the two points are connected by tracks running through a tunnel and over the high ground between the two places. There were no facilities for unloading flour at Croxton. The testimony of defendants' witnesses was that a carload of flour had never been known to be unloaded at Croxton for inspection.

It was the universal custom for shipment of flour under bills of lading, such as the one under which the flour in question was shipped, to be taken by the terminal railroad, the Erie Railroad Company, to

one of its docks at Weehawken, usually at dock C, and unloaded, whereupon the right of inspection could be exercised. The evidence shows that where such right was exercised, it was necessary to examine each bag of flour by an instrument called a "tryer" which was inserted into each bag through the covering, and a small amount of flour extracted. Following the arrival of trains at Croxton yards, they would be broken up and cars intended for a specific point, of which there were many in and about New York City, would be made up into a train and sent to their own proper destination. Defendant's witnesses testified that trains were made up at Croxton for Weehawken and taken over to that place as rapidly as practical under the circumstances; that the time of the arrival of cars at Weehawken from Croxton varied according to the rush of business, the weather, etc.; that sometimes these trains did not "go over" for twelve hours; that cars usually got over to Weehawken the same day on which they arrived at Croxton "within twenty-four hours;" that sometimes they would start over in an hour; that it might require several days for them to get to Weehawken but that would not be usual. The time required for the placing of the cars upon a dock after their arrival at Weehawken would also vary.

Immediately upon the arrival of each of the cars in question at Croxton, the Erie Railroad prepared and sent a notice to the Metropolitan Mill & Grain Company, located in New York City proper. As to the first car, the notice, which is substantially the same as the second, reads—

"Arrival Notice. Property described is ready for delivery by The Erie Railroad Co. New York Terminal. Lighterage Dept. Dock C8 Produce Exchange, N. Y. Date 1-26-21 Freight Bill No. Consignee and Address: Hoyland Flour Mill Co. Route: Notify Metropolitan Flour Mill Gr. Co. Prod. Exchange NY. NYExport TSTL Ohio City Way-billed from E. St. Louis, Ill. Way-bill date, and No. 7485 Full Name of Shipper Hoyland Flr. Mill Co. Car Initials and No. N. Y. C. 238381.

"(Stamped) Arrived, Oct. 26, 1921 Croxton, N. J."

The "Arrival Notice" as to the second car was stamped "Arrived, October 28, 1921, Croxton, New Jersey." On the back of each of the notices under the heading of "Special Notice," was printed a statement that the company was not responsible for any loss by fire, etc., occurring more than forty-eight hours (exclusive of holidays) after notice of arrival of the property had been sent or given and that its liability as a common carrier ceased then and the property might at its option be stored at the owner's risk. The Metropolitan Flour Mill & Grain Company acknowledged receipt of these notices upon a printed form headed "Consignee's Receipt of Arrival Notice" by signing its name thereto, giving the date and time of the

receipt of each notice. The receipt of the notice as to the first car shipped was dated, 1:05 P. M., October 26, 1921, and as to the second car, 9:40 A. M., October 29, 1921. The record shows that the first car was set out at the Weehawken docks at eight P. M. of October 26 and the second car at eleven P. M. of October 28. The first car was unloaded at Dock C. Weehawken at eleven A. M. of November 3rd and the second at 4:30 P. M. of November 2nd. A fire occurred a few minutes before midnight of November 3rd, destroying a number of docks of the Erie Railroad Company at Weehawken and consuming the flour in question. It was shown that no contract for the sale of any of this flour, either to a foreign or domestic customer, had been entered into at the time it was destroyed by fire. Having received the notices of the arrival of the flour at Croxton, the Metropolitan Flour Mill and Grain Company knew that sooner or later the shipment would be at the docks at Weehawken and the evidence shows that an agent of the Metropolitan Flour Mill and Grain Company, after the fire called up the office of the Erie Railroad to see if the flour had been burned.

It is contended by the defendants that the notices served upon the Metropolitan Flour Mill & Grain Company complied with the requirement of the bills of lading for forty-eight hours' notice of the arrival of the cars at destination and that, consequently, they were holding the flour as warehousemen at the time of its destruction and not as common carrier and that there is no liability to plaintiff in this suit, brought upon the theory of defendants' common-law liability as insurers, no negligence being shown or claimed by plaintiff. In defense to this cause of action, defendants pleaded, among other things, a provision of the bills of lading exempting the carrier from liability.

". . . For loss, damage, or delay caused by fire occurring after forty-eight hours (exclusive of legal holidays) after notice of the arrival of the property at destination or at port of export (if intended for export) has been duly sent or given, the carrier's liability shall be that of warehouseman only.

"Sec. 4. Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only, or may be, as the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

Appellate courts do not ordinarily interfere with the discretion vested in the trial court in granting a new trial on the ground that the verdict is against the weight of the evidence. However, this rule has an exception in that when it is shown that no verdict in favor of the party to whom the new trial was granted would be allowed to stand, such a court will interfere with the trial court's discretion in reference to the matter mentioned. [State ex rel. v. Ellison, 268 Mo. 225; Borack v. Mosler Safe Co., 288 Mo. 83.] As the facts are substantially undisputed, we think that this is one of the cases where the exception to the rule should be followed. In fact, defendants practically admit that a question of law only is involved, for they state in their brief—

"We submit that this was a question for the court to decide, and not the jury. That is, the construction of this notice was a matter of law—the duty of the court and not the jury. The facts being undisputed that a notice was given and received, it was the duty of the court to say whether or not as a matter of law it constituted a sufficient notice."

We are of the opinion that the notices served upon the Metropolitan Flour Mill & Grain Company did not comply with the requirement of the bills of lading. The undisputed testimony shows that, according to the custom and practices of the parties, when the destination of a shipment of flour was such as is described in the bill of lading in the case at bar, the point of delivery of the shipment was and should be at the docks of the Erie Railroad Company at Weehawken, New Jersey. While the evidence shows that Croxton is within the city limits of Jersey City and in the New York Terminal territory and included within the general term "New York Harbor," the evidence also shows that the term "New York Harbor" includes stations in an immense area in and about the city of New York proper, and extends from Bayonne, New Jersey, northwardly many miles, included within the term are docks along the New Jersey shore across from the Island of Manhattan, and various stations in Brooklyn. Under such circumstances, it was competent to show what was meant by the language used in the bills of lading described the destination of the shipments by showing the practice and custom in relation to delivery of such shipments, made under such circumstances. [Devato v. Eight Hundred and Twenty-three Barrels of Plumbago, 20 Fed. 510.]

Under the terms of the bills of lading, of course, there could not have been any delivery of the shipment at Croxton as it was necessary for the flour to be delivered at the water front, the bills of lading providing for lighterage. The contract of carriage also provided for the privilege of inspection, which could only be exercised where there.

were facilities for unloading cars. The purpose of giving the notice of the arrival of the flour was to afford the railroad, after the expiration of forty-eight hours, relief from its obligation as an insurer but as to the shipper, it was for the purpose of giving the "notify" party forty-eight hours, during which time such liability of the railroad would continue, in which to issue orders for the disposition of the shipment. This time was given so that within that period it could claim the shipment and surrender the bill of lading, or give lighterage instruction for further transportation to ship side for foreign shipment, or issue a diversion order if the car was to be sent to some other point in this country, or call for the shipments if it was to be used locally. The "notify" party was given forty-eight hours in which to do any one of these things before giving up the right to hold the carrier as an insurer.

By giving the notice while the shipment was at Croxton and before it reached the docks at Weehawken, necessarily the time of the "notify" party to make disposition of the shipment was restricted in any event; even though the cars arrived at the docks at Weehawken at the minimum time that cars took in going from Croxton to that place. Of course, it was entirely possible that the time required to get the cars to the docks would be a very material part of the forty-eight hours allowed for the doing of the things mentioned by the "notify" party. In this connection it will be remembered that as to one of the cars involved herein, the arrival notice was given before the car actually reached the docks at Weehawken while the notice stated that the shipment was "ready for delivery by the Erie Railroad Company New York Terminal" and, as before stated, "New York Terminal" in this instance meant the docks at Weehawken. The notices themselves show that they were notices of arrival of the cars at Croxton. In fact, the evidence is undisputed that they were sent upon the arrival at the cars there and not at Weehawken. As before stated, one of the cars had not arrived at Weehawken when the notice covering it was given. It had been the practice of the Erie Railroad a few years before the time of this occurrence to give notices of the arrival of such shipments at Weehawken but defendants' evidence shows that this had not been done for three or four years before the time in question. So it necessarily follows from all of this that the "notify" parties knew that the notices served upon it were not notices of the arrival of the cars at Weehawken. Upon the circumstances the notices were merely notices of the prospective arrival of the cars at Weehawken and not notices of their actual arrival. The "notify" party could not have any definite knowledge as to when the cars would be at Weehawken by these notices and it naturally follows that in order to find out when they arrived there,

it would be required to call up by telephone or send a messenger, to obtain this information.

The statement in the notices that the property was ready for delivery was false. That could not have been true until the cars were at least set out at the docks in Weehawken and as privilege of inspection was given by the bills of lading while the flour was in possession of the carrier, it would seem that the flour was not ready for delivery until it was unloaded as it could not have been inspected until this had been done.

A case not so strong as to the facts as those in favor of the plaintiff here, involving the same fire, the same terminal at Weehawken, a notice given of the arrival of the shipment when it arrived at Croxton, and similar provisions in the bill of lading, was decided against the carrier in a suit like this one. [See Pillsbury Flour Mills Co. v. Erie R. R. Co., 216 N. Y. Supp. 486.] In that case the court, 1. c. 488, said—

"The notice of arrival could not properly be given to transmute the carrier's liability into that of a warehouseman when the goods arrived at Croxton."

In that case the destination of the shipment was Dock D, Weehawken, New Jersey, while the destination of the shipment in the case at bar was New York City for Export, etc., which the evidence shows meant, in view of this and other provisions of the bills of lading, the docks of the Erie Railroad at Weehawken. So the two cases are not materially different from the standpoint of the destination of the shipments. However, they are different in that as to the first car shipped in the case at bar, the car was either at Croxton or somewhere between Croxton and Weehawken, when the notice of its arrival was given while in the New York case all of the cars had arrived at Weehawken prior to the delivery of the notice.

Defendant would have us either distinguish the New York case or give it no weight as an authority because it was written by a judge of an inferior court. It is impossible to distinguish it and as we believe that it is a well-reasoned case and is in accordance with our view of the law, we will follow it. While it is true that the case at bar involves an interstate shipment and therefore is governed by the laws of the United States as interpreted by the Federal courts, there being no Federal cases in point cited, we are at liberty to come to our own conclusion as to the Federal law involved. We think that there is no question but that plaintiffs were entitled to recover under all the facts, and the court would have been justified in instructing the jury to find for it. We have examined the cases cited by the defendants. In Berwind-White Coal Mining Co. v. Chicago & Erie R. R. Co., 235 U. S. 371, the Supreme Court reviewed a judgment award-

ing demurrage on carloads of coal shipped by plaintiff in error from West Virginia to Chicago and there to be reconsigned. It was insisted by plaintiff in error that the tariff authorized demurrage only at destination and that as the cars never reached their destination but were held for reconsignment at Hammond, Indiana, the demurrer charges were not justified. The evidence showed that the storage tracks of the railroad for cars billed to Chicago on reconsignment, were at Hammond, a considerable distance from the terminals of the railroad company, which were nearer the center of Chicago, but were convenient to the Belt Line by which cars could be transferred to any desired new destination, and the holding of such cars on such tracks consigned as those in question, was in accordance with a practice that had existed for more than twenty years. Under such circumstances it was held that the contention of plaintiff in error was so "wholly wanting in foundation as in fact to be frivolous." It seems to us that that case is more an authority for plaintiff herein than for defendant. In that case it was shown by custom that shipments, like the one involved therein, for Chicago to be reconsigned, were to be held at Hammond, Indiana, awaiting a reconsignment order by the shipper and that therefore they were subject to demurrage at Hammond under the tariff relating to liability for demurrage. In the case at bar it was shown by a practice and custom that flour consigned, as was the flour involved herein, should be delivered to the docks at Weehawken, a convenient place for inspection and lighterage. Had Croxton been such a place, its relationship to the shipment involved herein might have been somewhat similar to Hammond with respect to the coal which was the subject of the Berwind-White Coal Mining case. The case of United States v. Erie Rv. Co., 209 Fed. 283, cited by defendants, was also a reconsignment case. In distinguishing such cases from those involving delivery at point of destination, the court in that case, l. c. 285, said—

"The tariff and schedule, establishing demurrage charges of $1 per day a car from the receipt of notice by the consignee until the cars are released, do not particularize the manner of delivery or the place of unloading, and, as the shipment of coal was for reconsignment, it was obviously unnecessary in this case to use more specific language as to such matters. Though it is a common practice for railroad companies to deliver freight at particular places on their lines, at piers, wharves, private sidings, or points connecting with lines of other carriers, yet, as the commodity in question was concededly to be reconsigned, the rule of personal delivery, emphasized by various citations in defendant's brief, has no application."

The situation in the case at bar is more like that in the case of Bank v. R. R. Co., 135 Mo. App. 74. We have examined the other cases cited by defendants and find they are not in point.

It is claimed that the "notify" party had actual notice of the arrival of the cars at Weehawken but the evidence is to the contrary. The notices of the arrival of the cars at Croxton cannot be treated as the giving of the notices provided by the contract of carriage on account of the custom of not giving notice of arrival of cars at the docks at Weehawken. It is not permissible to vary the requirements of a written contract by custom. [Kemper Mill & Elevator Co. v. Hines, 293 Mo. 88; Hirsch v. Georgia Iron & Coal Co., 169 Fed. 578; Great Lakes Coal & Dock Co. v. Seither Transfer Co., 220 Fed. 28; National Bank of Commerce v. Southern Ry. Co., 135 Mo. App. 74.]

Waiver of notice of arrival is claimed by defendants because the Metropolitan Flour Mill & Grain Company acknowledged the receipt of the notices, which were headed "Consignee's Receipt for Arrival Notice" and it did not expect any further notice because none were being given at the time. Waiver was not pleaded but the answers were on the theory of compliance with the provisions of the contract in reference to the actual giving of the notice. [Bank v. Hatch, 78 Mo. 1.]

It is insisted that the trial court erred in permitting plaintiff to base its damages on the value of the flour at Kansas City instead of at New York City and for this error, alone, the action of the court in granting a new trial should be sustained by this court. The bills of lading provided that "the amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property at the place and time of shipment under this bill of lading, including freight charges, if paid." It is contended by defendants that this portion of the bills of lading is void as being in conflict with the Cummings Amendment, citing in support thereof the case of C. M. & St. P. R. R. v. McCaull-Dinsmore, 260 Fed. 835. Whether the provision quoted in the bills of lading is binding upon defendants, we need not say for the reason that, while the court permitted evidence of the value of the flour at Kansas City and submitted to the jury plaintiff's measure of damages based upon that value, the record shows that the value of the flour at New York was somewhat greater than its value at Kansas City plus the freight, therefore, defendants were not harmed by the action of the court in submitting the value of the flour at Kansas City at the time of its destruction. It is true that while it appears that defendants tried the case upon the theory that the Kansas City value was not the measure of damages, a fair construction of the record also shows that they tried the case upon the theory that the market value of the flour at Kansas City and New York testified to by the witness for plaintiff was the actual value; in other words, it was conceded that

these values were the actual values at the points mentioned. [Davidson v. Transit Co., 211 Mo. 320, 356, 361, inclusive.] From what we have said the judgment should be reversed and the cause remanded with directions to the trial court to reinstate the verdict and it is so ordered. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.