

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-5-2007

# CSX Trans Co v. Novolog Bucks Cty

Precedential or Non-Precedential: Precedential

Docket No. 06-3431

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"CSX Trans Co v. Novolog Bucks Cty" (2007). *2007 Decisions*. Paper 354.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/354

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-3431

CSX TRANSPORTATION COMPANY,

Appellant

v.

NOVOLOG BUCKS COUNTY

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 04-cv-04018)
District Judge: Hon. Thomas N. O'Neill, Jr.

Argued on July 12, 2007

Before: SLOVITER, ALDISERT and ROTH, <u>Circuit Judges</u>

(filed: September 5, 2007)

Paul D. Keenan, Esquire **(Argued)**
Charles L. Howard, Esquire
Keenan, Cohen & Howard, P.C.
One Commerce Square
2005 Market Street, Suite 3520
Philadelphia, PA 19103

        Counsel for Appellant, CSX Transportation, Inc.


Frederick A. Tecce, Esquire **(Argued)**
McShea Tecce, P. C.
The Bell Atlantic Tower, 28th Floor
1717 Arch Street
Philadelphia, PA 19103

        Counsel for Appellee, Novolog Bucks County


John K. Fiorilla, Esquire **(Argued)**
Capehart Scatchard, P. A.
8000 Midlantic Drive, Suite 300
Mount Laurel, NJ 08054

        Counsel for Amici Curiae, Norfolk Southern
        Railway Company and BNSF Railway Company

---

2

# OPINION

**ROTH**, <u>Circuit Judge</u>:

This appeal concerns the liability of entities such as warehousemen, pier operators, transloaders, and connecting carriers for demurrage charges, *i.e.*, penalties assessed by railroads when shippers or recipients of freight do not timely return railcars to service after loading or unloading. The railroad in this case sought to assess demurrage charges against a transloader for delays in returning both inbound and outbound railcars to service. With respect to inbound freight, the transloader received loaded railcars on behalf of steel companies or others and forwarded the steel by ship toward mostly foreign destinations; with respect to outbound freight, it ordered empty railcars, which it then loaded with steel for transportation by the railroad to domestic destinations. The transloader objected to the assessment, arguing that it could not be subjected to charges under an agreement – namely, the transportation contract – to which it was not a party.

We hold that the consignee-agent provision of the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10743(a)(1), governs this dispute as to the charges assessed against Novolog as the consignee of freight. Under this provision a transloader or other such entity, if named on the bill of lading as the sole consignee, is presumptively liable for demurrage charges arising from unloading delays, unless it accepts the freight as the agent of another and notifies the carrier of its status in writing prior to delivery. Because the factual

3

record was not sufficiently developed, however, we cannot determine what the bills of lading showed here; thus we vacate the District Court's order granting judgment to the railroad as a matter of law and remand for further proceedings.

With respect to the transloader's potential liability for demurrage charges in its role as the shipper (consignor) of freight, we refrain from announcing a holding because the question was not fully addressed or briefed, but we will vacate the District Court's grant of judgment on this claim as well and remand it for further consideration in light of our holding regarding consignee liability.

Finally, we hold that the District Court did not abuse its discretion when it refused to refer an issue to the Surface Transportation Board (STB), where the party moving for referral did not invoke the doctrine of primary jurisdiction until after the District Court had already decided the issue and the question was not one on which the expertise of the STB was not crucial to the decision.

## I. **Factual and Procedural Background**

The parties in this litigation are businesses engaged in the interstate transportation of freight. CSX Transportation, Inc. ("CSX") is a rail common carrier; Novolog Bucks County ("Novolog") is a private port with access to a rail-served industrial facility on the Delaware River.

As relevant here, the Novolog port functioned as a transfer point for the import, export, and domestic transportation of steel. Following instructions from various steel companies, CSX delivered to Novolog railcars loaded with steel, which Novolog unloaded and transferred onto other means of transportation. In addition, when Novolog so requested, CSX placed empty railcars

4

at Novolog's disposal for loading with imported steel and transportation to domestic destinations. Novolog did not have an ownership interest in any of the shipments at issue here, but rather received and forwarded cargo on behalf of others and on their instructions.

According to CSX's Tariff, a person receiving its railcars for unloading, or ordering empty railcars for loading, had two days to do so and return the cars to service; if the cars were kept beyond this time, demurrage charges would be assessed.[1] In particular, CSX's Tariff Item 8070-G provided that "[u]nless otherwise advised [,] consignor at origin or consignee at destination will be responsible for the payment of demurrage rates."

During the early part of 2003, fluctuations in the price of

---

[1] Demurrage is "a charge exacted by a carrier from a shipper or consignee on account of a failure to load or unload cars within the specified time prescribed by the applicable tariffs. Railroads charge shippers and receivers of freight 'demurrage' fees if the shippers or receivers detain freight cars on the rails beyond a designated number of days." *Union Pacific Railroad Co. v. Ametek, Inc.*, 104 F.3d 558, 559 n.2 (3d Cir. 1997) (internal quotations and citation marks omitted).

Under prior statutory regimes, railroads' tariffs, including tariffs regarding demurrage charges, had to be filed with the Interstate Commerce Commission (ICC). After the enactment of the Interstate Commerce Commission Termination Act (ICCTA) in 1996, the Interstate Commerce Commission was replaced with the Surface Transportation Board (STB) and filing of tariffs was no longer required. CSX's Tariff 8100 is published by CSX on its web site and specifically incorporated into all its transportation agreements.

steel caused a significant increase in the amount of steel delivered for export to the Novolog facility. As a result, Novolog was unable to perform loading and unloading operations within the two-day time frame established by the Tariff, and CSX began charging Novolog demurrage fees, which totaled $260,304 by August, 2003. Novolog refused to pay, arguing it was not liable for demurrage since it was not a party to the bills of lading or other contracts regarding the shipments at issue and had no responsibility for or control over the volume of railcars that entered its facility.[2] CSX then brought this action in the Eastern District of Pennsylvania seeking payment of the demurrage charges, with interest, and attorney fees. It argued that Novolog was liable under the tariff because it was listed in the bills of lading either as the sole consignee for the freight (where the charges arose from unloading delays) or as the shipper (where the charges arose from loading delays).[3]

After discovery the parties filed cross-motions for summary judgment. CSX submitted documents appearing to show that in each of the instances for which CSX assessed demurrage charges against Novolog for delays in unloading, Novolog was listed as the sole consignee on the waybills, without any limiting designations such as "care of" or "account of," and in each of the instances for which CSX assessed demurrage charges against Novolog for loading delays, Novolog was listed

---

[2] A bill of lading is "the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers." *S. Pacific Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982) (internal citation omitted).

[3] Novolog filed a counterclaim, on which it eventually prevailed at trial. The counterclaim has no relevance to the issues before us.

6

as the shipper on the waybills.[4] In addition, CSX presented to the District Court many pages of computer spreadsheets purporting to reflect the fact that Novolog was named as either the consignee or the shipper on the corresponding  bills of lading.

Novolog  contested the admissibility of the documents presented by CSX and argued they were not actual bills of lading. It also submitted the deposition of David Reid, the CEO of Novolog during the relevant period, who testified that Novolog had not given permission to be listed as consignee for the freight in the railcars at issue and had not created or executed any of the bills of lading for the shipments that resulted in demurrage charges.

On May 24, 2006, the District Court denied both parties' summary judgment motions regarding the demurrage dispute. The court rejected CSX's theory that Novolog became subject to liability by accepting freight as the named consignee on the bills of lading or by ordering cars as the named shipper; it therefore declined to resolve the evidentiary issues or to make a finding of fact as to whether Novolog was indeed named as the consignee

------

[4] A waybill is a "[w]ritten document made out by [the] carrier listing point of origin and destination, consignor and consignee, and describing goods included in shipment . . .." *Black's Law Dictionary* 1429 (5th ed. 1979). According to the Sixth Circuit Court of Appeals, "the bill of lading is a title document, while the waybill describes the freight, its route, and the carriers involved in its shipment.  The waybill accompanies the freight throughout the shipment and into the hands of the destination carrier." *Missouri Pacific R. Co. v. Escanaba and Lake Superior R. Co.,* 897 F.2d 210, 211 (6th Cir. 1990).  The record does not clarify what significance, if any, the parties ascribe to the different role played by the waybills and the bills of lading that accompanied the shipments at issue.

or as the shipper in the bills of lading. *See CSX Transp. v. Novolog Bucks County*, No. 04-CV-4018, 2006 WL 1451280, at *3 n.3-5, *4 n.6 (E.D. Pa. May 24, 2006). It held, however, that summary judgment was inappropriate because there remained an issue of material fact as to whether Novolog had entered a separate contractual agreement with CSX that might make it liable to the charges.

Following the issuance of the opinion denying the cross-motions for summary judgment, CSX filed an admission that "other than Novolog being the named consignee on bills of lading, and Novolog having accepted delivery of the loaded cars by CSX, CSX had no separate contractual relationship with Novolog governing the movement and / or disposition of the detained rail cars." As a result the District Court entered judgment as a matter of law in favor of Novolog on July 12, 2006.

CSX then filed a motion for reconsideration and an alternative motion for referral to the STB. The District Court denied the motion for reconsideration as untimely and denied the motion for referral "because [its] memorandum and order of May 24, 2006 [was] not tantamount to an attack upon the reasonableness of the tariff terms." CSX filed this timely appeal.

## II. <u>Discussion</u>

### A. Jurisdiction

We have jurisdiction of this appeal from a final order of the District Court under 28 U.S.C. § 1291. The District Court had diversity jurisdiction under 28 U.S.C. § 1332 and federal question jurisdiction under 28 U.S.C. § 1337 over a cause of action arising under the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.*

Although the subject matter jurisdiction of the District Court is not in question, before we turn to the merits we must address CSX's contention that the District Court, in rendering its decision, usurped the primary jurisdiction of the STB. CSX urges that in holding that it could not exact demurrage charges from parties such as Novolog, the District Court implicitly declared its tariff unreasonable, a determination reserved statutorily to the STB. *See* 49 U.S.C. § 10702 (mandating that rail carriers shall establish reasonable rates, rules, and practices); 49 U.S.C. § 10704.

The District Court refused to refer the matter to the STB on the grounds that its decision did not amount to a finding that CSX's rates were unreasonable. On appeal, CSX argues that although the District Court's opinion may not have expressly held CSX's demurrage tariff unreasonable, it nonetheless "gutted it and rendered it ineffective." Novolog responds that CSX's motion for conditional referral was untimely because it was filed beyond the time limit provided for motions for reconsideration and that in any event it lacks substantive merit. A district court's decision not to submit an issue for initial determination by an administrative agency is reviewed for abuse of discretion. *Puerto Rico Mar. Shipping Auth. v. Valley Freight Sys.*, 856 F.2d 546, 549 (3d Cir.1988).

Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . .." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1965). In such cases, courts may refer specific questions to the administrative body charged with their resolution. *See* 28 U.S.C. § 1336 (district courts may refer an action to the Surface Transportation Board for determination.)

9

Unlike objections to subject matter jurisdiction, which can be raised at any point, primary jurisdiction arguments can be waived. *Baltimore & Ohio Chicago Terminal R.R. v. Wisconsin Cent. Ltd.*, 154 F.3d 404, 411 (7th Cir. 1998); *see also Northwest Airlines v. County of Kent*, 510 U.S. 355, 366 n.10 (1994) (declining to invoke the primary jurisdiction doctrine where the parties had not raised the issue). Primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *W. Pac. R.R. Co.*, 352 U.S. at 63. It does not strictly limit the power of the courts, but rather is intended to "serve as a means of coordinating administrative and judicial machinery and to promote uniformity and take advantage of the agencies' special expertise." *Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 215 F.3d 195, 205 (1st Cir. 2000).

No coordination would be achieved by requiring a District Court, *after* it has rendered a judgment, to vacate that judgment upon motion and refer a question it has already decided to an agency. CSX could have filed a petition for declaratory action with the STB once it became clear that Novolog was contesting the charges or could have raised the issue of primary jurisdiction at any time during the preliminary phases of the litigation. Instead it chose to wait until judgment had been entered, and then requested a second bite at the apple. In addition, the STB's expertise, while helpful, would not have been crucial to the determination of the issues here, which involve the analysis of precedent and statutory interpretation. We therefore hold that the District Court did not abuse its discretion in denying CSX's motion for conditional referral to the STB.[5]

---

[5] Our opinion in *MCI Telecomm. v. Teleconcepts*, 71 F.3d 1086 (3d Cir. 1995), is not to the contrary. There we held that the doctrine of primary jurisdiction mandated referral of a question requiring the interpretation and application of a local

## B. Liability for demurrage charges of a named consignee that accepts freight

The most important and vigorously argued issue in this case is whether a transloader or connecting carrier such as Novolog can become subject to liability for demurrage charges by being listed as the consignee in a bill of lading and accepting delivery of the freight listed therein, even if it does not have a beneficial interest in the freight and has not authorized the shipper or the carrier to list it as the consignee. The District Court held, as a matter of law, that it cannot. We review its judgment *de novo*. *A.W. v. Jersey City Public Schools*, 486 F.3d 791, 794 (3d Cir. 2007).

The District Court held, first, that whether or not Novolog was in fact listed as the sole consignee in the bills of lading, that unauthorized and unilateral designation was not sufficient to make it a legal consignee for purposes of imposing demurrage liability. *CSX*, 2006 WL 1451280, at *8, *11. [6] Second, the

telephone company's tariff to the Pennsylvania Public Utilities Commission (PUC). We based that decision on the nature of the question to be decided, which the Pennsylvania Supreme Court had held to be one peculiarly within the special expertise of the PUC. The same deference is unnecessary here.

[6] As mentioned, the District Court initially held that a genuine issue of material fact remained as to whether a separate contract between Novolog and CSX, known in the litigation as the Refund Contract, constituted a contractual agreement regarding the railcars that could subject Novolog to liability for demurrage charges. That issue was subsequently resolved by CSX's admission that it did not. With the last issue of material fact eliminated, the District Court then granted judgment as a

District Court dismissed CSX's argument that Novolog was liable as the agent of an undisclosed consignee principal, since "this rule of law only applies where an agent actually is entering into a contract on behalf of the principal." *Id.* at *9. Third, the District Court held that CSX was not liable for demurrage under the statutory terms of ICCTA's consignee-agent liability provision, 49 U.S.C. § 10743(a)(1) (providing for liability of consignee-agents who do not notify carrier of agency relationship), since that section "relates only to the payment of rates for shipment of freight not demurrage and . . . demurrage charges are distinct from transportation rates." *Id.* at *10. Finally, the District Court rejected CSX's argument that Novolog's knowledge of the industry practices, its acceptance of notices that railcars had been delivered, and its requests for railcars confirmed that it was the legal consignee or consignor of the shipments.

We hold that recipients of freight who are named as consignees on bills of lading are subject to liability for demurrage charges arising after they accept delivery unless they act as agents of another and comply with the notification procedures established in ICCTA's consignee-agent liability provision, 49 U.S.C. § 10743(a)(1).

We take as our starting point two well-established and oft-repeated principles. The first is that liability for freight charges, including demurrage charges, may be imposed against a consignor, consignee, or owner of the property, or on others by statute, contract, or prevailing custom. *Illinois Cent. R.R. Co. v. South Tec Dev. Warehouse*, 337 F.3d 813, 820 (7th Cir. 2003) (internal quotation marks and citation omitted); *Middle Atl. Conference v. United States*, 353 F. Supp. 1109, 1118 (D.D.C. 1972) (three-judge panel). The second is that the consignee

matter of law for Novolog.

12

becomes a party to the transportation contract, and is therefore bound by it, upon accepting the freight; thus it is subject to liability for transportation charges even in the absence of a separate contractual agreement or relevant statutory provision. *See Louisville & Nashville Ry. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 70 (1924) ("if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later")*; Erie R. Co. v. Waite*, 114 N.Y.S. 1115 (1909) (demurrage may be imposed upon consignees independently of statute or express contract)*; Gage v. Morse*, 12 Allen 410, 90 Am. Dec. 155 (Mass. 1866) ("[i]f the consignee will take the goods, he adopts the contract").[7]

Historically the principle governing the liability of parties named as consignees in the bill of lading was a simple one of notice. In general "a consignee as such under a straight bill of lading [was] liable [because] treated as presumptive owner and compelled to pay." *In re Tidewater Coal Exch.*, 292 F. 225, 234 (D.C.N.Y. 1923) (Hand, J.). However, if the consignee was "known [by the carrier] not to be the owner" but a mere "factor" or agent, the consignee was not liable for demurrage. *Id.* The carrier might have notice of the relationship because the bill of lading included language such as "care of" or "account of," or might simply know of the agency through long dealing even if

---

[7] The status of owners is somewhat more complex and not relevant here since the parties agree that Novolog did not have a beneficial interest in the cargo. *See, e.g., Wheaton Van Lines, Inc. v. Gahagan*, 669 A.2d 745, 749 (Me. 1996) ("consignee" defined to include "an owner of shipped goods who is identified to the carrier as the intended recipient of the goods, who does in fact accept the goods not as an agent but for itself, and who in every way but designation on a bill of lading acts as a consignee.")

13

the bill of lading failed to disclose it. *Id.* at 233-34. In either case, the principal rather than the agent would be liable. *Id.*

These common law principles are reflected in ICCTA's consignee-agent liability provision, titled "Liability for payment of rates," which provides in relevant part:

> Liability for payment of rates for transportation for a shipment of property by a shipper or consignor to a consignee other than the shipper or consignor, is determined under this subsection when the transportation is provided by a rail carrier under this part. When the shipper or consignor instructs the rail carrier transporting the property to deliver it *to a consignee that is an agent only*, not having beneficial title to the property, the consignee is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but *not for additional rates that may be found to be due after delivery* if the consignee gives *written notice* to the delivering carrier *before delivery of the property–*
>
>> (A) *of the agency and absence of beneficial title*; and
>>
>> (B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading.

49 U.S.C. § 10743(a)(1) (emphasis added).

This section appears designed to address precisely the case before us, namely, the situation where a carrier assesses

14

charges after delivery against the named consignee and recipient of the freight, but the consignee/recipient contests its liability for the charges on the grounds that it is a mere middleman. Building on the common law, it adopts the principle that the named consignee becomes a party to the transportation contract upon receipt of the freight and is thereafter liable for all relevant charges, whether immediately due or arising after delivery, unless the consignee is an agent and the carrier has notice of this. It adds precision to the common law tradition, however, by clearly laying out what a named consignee/recipient must do to avoid liability on the grounds that it is an agent. The requirements are not burdensome: the consignee is obligated merely to notify the carrier, in writing, of the agency relationship.

Novolog, however, disputes that this section is applicable to this case. It argues, first, that Section 10743 applies to "rates for transportation," which do not include demurrage charges. Second, it contends that it is not a consignee merely by dint of being so designated, without its consent, on the bills of lading, and therefore the section cannot apply to it. We disagree.

First, we need not stray far to discover what the provision means by "rates for transportation," since the statute itself contains a definition section. As used in ICCTA, "'transportation' includes":

> (A) a locomotive, *car, vehicle*, vessel, warehouse, wharf, pier, dock, yard, property, facility, *instrumentality, or equipment of any kind* related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including receipt,

15

> delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . ..

49 U.S.C.§ 10102(9) (emphasis added). There can be little question that railcars – as cars, vehicles, instrumentalities, or equipment related to the movement of property by rail – are encompassed by this definition.

Although to our knowledge no court has spoken directly to the applicability of Section 10743(a)(1) to demurrage rates, both the former ICC and a three-judge panel of the District Court for the District of Columbia, faced with a substantially identical provision applicable to motor carriers, have also found it applicable to detention (*i.e.,* demurrage) charges. In *Payment for Detention Charges, Eastern Central States*, 335 I.C.C. 537 (I.C.C. 1969), the agency relied in part on Section 223 of the ICC Act, 49 U.S.C. § 323 (1964), to decide whether a trucking association's tariff was unlawful. The ICC held without hesitation that the phrase "transportation charges in respect to the transportation of . . . property" in that provision "of course [] would encompass charges for demurrage or detention of vehicles. . . . While detention charges have a purpose different from that of freight charges, . . . *demurrage charges are part of the total transportation charges.*" *Payment for Detention Charges*, 335 I.C.C. at 539-40 (emphasis added).[8] Upon review, a three-judge panel of the District Court for the District of Columbia agreed with the ICC, writing that the term

---

[8] There is no substantive difference between the terms "transportation charges" and "rates for transportation" in the statute. *See* Historical and Revision Notes to 49 U.S.C. § 10744 (1982) ("[t]he word 'rates' is substituted for 'charges' for consistency in view of the definition of 'rate' in section 10102 of the revised title").

16

"transportation charges" in Section 223 of the ICC Act "may include detention charges." *Middle Atl. Conference v. United States*, 353 F. Supp. 1109, 1121 n.34 (D.D.C. 1972).[9] We thus hold that demurrage rates are "rates for transportation" under Section 10743.

Having determined that ICCTA's consignee-agent notification provision applies to the assessment of demurrage

---

[9] In 1981, the Court of Appeals for the Seventh Circuit interpreted a predecessor of our current Section 10743 as not applying to detention charges. In *Blanchette v. Hub City Terminals*, 683 F.2d 1008 (7th Cir. 1981), it wrote that "[t]he purpose of [49 U.S.C. § 3.2 (1976)] was to relieve from liability agent-consignees who paid in full carriers' initial bills, which the carrier later discovered were lower than the rate required by the tariff." *Id.* at 1011. Although this is clearly one of the purposes of the provision, it by no means excludes its applicability to other kinds of charges that can arise after delivery. Thus we decline to so limit its reach.

We also note that our opinion in *Baltimore & Ohio Chicago Terminal R.R. Co. v. United States*, 583 F.2d 678, 690-91 (3d Cir. 1978), does not govern. There we held that the provisions of the then-current statute prohibiting rebates did not invalidate a proposed regulatory scheme by which the carrier was obligated to remit a certain portion of the billed demurrage charges to the actual owner of the rail car: these provisions (the then-current 49 U.S.C. § 15(15) and 41(1)) did not regulate demurrage charges, since the latter were "car service regulation[s]" as opposed to transportation rates and charges as those terms were used in the provisions at issue. Our decision was based on an analysis of the intent of the particular provisions at issue and does not affect our interpretation of a different provision here.

charges, we must decide whether it automatically applies to entities that are named as consignees on the bills of lading or whether more is required to turn such entities into "legal consignees" subject to it.

Novolog argues that the shipper's or carrier's unilateral decision to designate Novolog as the consignee, without Novolog's permission and where Novolog is not the ultimate consignee of the freight, cannot establish its status as a consignee for purposes of demurrage liability under the statute or otherwise. We disagree for three reasons. First, nothing in the statutory language suggests that it intends to restrict the term "consignee" to the ultimate consignee of the freight or use it to mean anything other than the person to whom the bill of lading authorized delivery and who accepts that delivery. Second, to hold that the documented designation of an entity as a consignee and that entity's acceptance of the freight is insufficient to hold it presumptively liable for demurrage charges would frustrate the plain intent of the statute, which is to establish clear, easily enforceable rules for liability. And third, to the extent that Novolog's suggests that it would be inequitable to treat the named consignee as presumptively liable, that argument is unpersuasive.[10]

As always, the starting point for interpreting a statute is the language of the statute itself. *Hallstrom v. Tillamook County,* 493 U.S. 20, 25 (1989). Unlike with the phrase "rates for transportation," ICCTA does not define the term "consignee" or its cognates. It is a fundamental canon of statutory construction, however, that "unless otherwise defined,

---

[10] It goes without saying that Novolog's lack of ownership of the freight is immaterial, since the provision is specifically directed at consignees "not having beneficial title to the property." 49 U.S.C. § 10743(a)(1).

words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). In common usage, the term means nothing more than the person to whom cargo is delivered following instructions. *See Webster's Third New International Dictionary* (1971) (defining "consignee" as "one to whom something is consigned or shipped"); *Black's Law Dictionary* (6th ed. 1990) (defining "consignee" as "[o]ne to whom a consignment is made[; p]erson named in bill of lading to whom or to whose order the bill promises delivery; [i]n a commercial use, . . . one to whom a consigment may be made, a person to whom goods are shipped for sale, or one to whom a carrier may lawfully make delivery in accordance with his contract of carriage, or one to whom goods are consigned, shipped, or otherwise transmitted"). There is simply no reason to read the word "consignee" in section 10743 as having the more restricted meaning of ultimate consignee.[11]

---

[11] Again, we agree with the *Middle Atlantic Conference* court's analysis of a substantially identical provision in the part of the statute dealing with motor carriers. The court wrote that Section 223 of the Interstate Commerce Act, 49 U.S.C. § 323 (1964),

> is addressed essentially at the problem *of the warehouseman, carrier, etc.*, who, while acting as agent for an undisclosed principal, *appears as consignee on the bill of lading.* . . . [W]ith respect to "transportation charges" (which may include detention charges), the statute provides that a consignee might escape that obligation if certain conditions of notice are satisfied.

*Middle Atl. Conference*, 353 F. Supp. at 1121 n.34 (emphasis added).

19

The statutory language also fails to support the contention that an entity can be considered a consignee for demurrage purposes only when it has consented to the designation in the bill of lading. Indeed, the statute envisages specifically the situation where "*the shipper or consignor* instructs the rail carrier transporting the property to deliver it to a consignee that is an agent only," 49 U.S.C. § 10743(a)(1) (emphasis added), *i.e.*, where the person designated by the shipper or consignor as the consignee is *not* in fact the person who would normally be responsible for the charges, but is only an agent (more properly designated, for instance, as a "care of" party).[12]

---

Although we do not rely on them for primary guidance, we also note that both the Uniform Commercial Code and the Federal Bills of Lading Act define "consignee" in a manner consistent with our interpretation. *See* U.C.C. § 7-102(3) ("'Consignee' means a person named in a bill of lading to which or to whose order the bill promises delivery"); 49 U.S.C. § 80101(1) (1994) ( "consignee" is "the person named in a bill of lading as the person to whom the goods are to be delivered").

[12] The alleged bills of lading in this case designate Novolog as the sole consignee, without any indication that it is an agent. If the bills of lading already contain a designation such as "care of," however, the agency relationship is considered disclosed and the consignee-agent is not subject to liability for demurrage charges. *See R. Franklin Unger, Trustee of the Ind. Hi-Rail Corp., debtor – Petition for Declaratory Order – Assessment and Collection of Demurrage of Switching Charges*, STB Docket No. 42030, 2000 STB Lexis 333, n.13 ("demurrage and detention charges . . . do not apply to agents acting for the principal parties to the transportation [if] the agency relationship [is] disclosed"; if the "waybills contain . . . language that would clearly establish or refer to an agency relationship," the

20

To hold, as Novolog asks us to do, that the designation in the relevant bills of lading should not be given effect without some further evidence of consent or involvement would also frustrate the plain intent of Section 10743, which is to facilitate the effective assessment of charges by establishing clear rules for liability.

Railway demurrage charges have "from the start been inseparably coupled with the car supply question." Harleigh H. Hartman, *Law and Theory of Railway Demurrage Charges* 9 (1928). Their most important purpose is to encourage the prompt return of freight cars to service so as to guarantee the steady flow of rail freight. *See Pennsylvania R.R. Co. v. Kittaning Iron & Steel Mfg. Co.*, 253 U.S. 319, 323 (1920) (purpose of demurrage charges is "to promote [railcar] efficiency by penalizing undue detention of cars.") Congress's concern with ensuring that railcars be available for transportation and not sidelined or improperly used as storage facilities is reflected in 49 U.S.C. § 10746, which provides that rail carriers "shall compute demurrage charges, and establish rules related to those charges, in a way that fulfills the national needs related to – (1) freight car use and distribution; and (2) maintenance of an adequate supply of freight cars to be available for transportation of property." Compensation of the railroads for the use of their equipment is a secondary purpose of demurrage charges. *Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Ry.Co.*, 271 U.S. 259, 262 (1926); 4 Saul Sorkin, *Goods in Transit* § 25.02[1] & n.2 (updated 2007) (collecting cases).

For demurrage charges to fulfill their purpose of ensuring the smooth functioning of the rail freight system by creating disincentives against delays, railways must be able to assess

agency relationship is considered disclosed.)

21

them effectively and without being mired in disputes. Section 10743 is designed to ensure just that. The simple rule that the named consignee becomes liable for demurrage charges upon acceptance of the freight unless it timely notifies the carrier of an agency relationship allows railroads to rely on the bills of lading and avoid wasteful attempts to recover from the wrong parties. For their part, recipients of freight who should not be saddled with liability for transportation charges arising after delivery can escape it with little effort by simply providing written notice of their status to the carrier.

Finally, although Novolog suggests that it would be inequitable to allow a carrier's or shipper's unilateral choice of designation to make it party to the transportation contract, no unfairness results from applying the statute's plain language. Under the statutory scheme, the named consignee can avoid liability in two ways: first, by refusing the freight (which Novolog concedes it could have done); and second, by providing the carrier timely written notice of agency under Section 10743(a)(1), if appropriate. The rail carrier, in contrast, has no option but to deliver the freight to the consignee named by the shipper, whether that be the ultimate consignee or owner or a middleman such as a transloader or warehouseman. As *amici* railroads argue, such middlemen generally have no incentive to enter into separate contracts with carriers that would make them responsible for demurrage charges; if they cannot easily be held accountable for their own delays, they may simply decide to use the rail cars as free storage. Holding such entities presumptively responsible for delays occurring while the railcars are under their control under the clear rule of Section 10743 ensures that the railroads will be able to assess demurrage, while also making it possible for all parties (carriers, middlemen such as Novolog, shippers, and ultimate consignees) to allocate the risk of liability by private contract, if they so choose.

22

For these reasons we decline to follow the Court of Appeals for the Seventh Circuit's recent conclusion in a similar case that the entity listed as the consignee on the relevant bills of lading was not, without more, the legal consignee under Section 10743. *See South Tec*, 337 F.3d at 821. *See also Union Pacific Railroad Co. v. Carry Transit*, No.3:04-CV-1095-B (N.D. Tex. Oct. 27, 2005) (following *South Tec*). In *South Tec*, a printing company (Donnelley) had an agreement with a carrier (the Illinois Central Railroad) to transport paper from Donnelley's paper suppliers to the South Tec warehouse. There the paper was sorted and stored and the railcars released. When Donnelley needed the paper, it was loaded on other railcars or trucks and brought to the Donnelley facility. According to Donnelley's agreement with Illinois Central, the bills of lading should state simply that the car was "to stop at South Tec Warehouse . . .. Freight Charges Cover Shipments to Ultimate Destination." *Id.* at 814-15. Although at least ninety percent of the bills of lading named Donnelley as the consignee, however, there was a wide variation among the bills of lading, and a small percentage named South Tec as the consignee. *Id.* at 815, 821.

The District Court held that South Tec was liable for the demurrage charges because it had failed to comply with the notification requirements of 49 U.S.C. § 10743(a)(1). The Court of Appeals disagreed, noting that the District Court had apparently assumed that South Tec was indeed the consignee of the freight for purposes of the statute, and remanded for a determination of "who was the legal consignee (or consignees) of the paper shipments in question." *Id.* at 822.

In remanding, the Court of Appeals did not strictly rule out the possibility that South Tec might in fact qualify as a consignee under the statutory provision, but it intimated that, without more, the facts then in the record made it unlikely. It held that "being listed by third parties as a consignee on some

23

bills of lading is not alone enough to [become] a legal consignee liable for demurrage charges, although it, coupled with other factors, might be enough to render South Tec a consignee." *South Tec*, 337 F.3d at 821. Although the court did not explain what additional factors might be considered, it suggested that one of the factors militating *against* finding South Tec to be a consignee under the statute was that the railroad had notice of South Tec's agent status because of the large number of bills of lading designating it as a "care of" party. *Id.*[13]

In our view the *South Tec* court's approach frustrates the statute's intent in two ways. First, in contrast to the statute's clear rule, *South Tec* envisages a "designation-plus" analysis under which the entity named as the consignee on the bill of lading would be presumptively liable for demurrage only if "other factors" were present. Under such a regime, railroads would be forced to second-guess their bills of lading and perform indeterminate weighing tests before deciding who is to be charged. And second, *South Tec* suggests that consignees must satisfy the notification requirements of Section 10743 only when the carrier does not already have notice – through other bills of lading or otherwise – that the named consignee is acting as the agent of another. Practically, this would require consignees and railroads alike to ask with respect to each shipment whether, in the universe of shipments involving the same actors, a sufficient number of bills of lading have clarified the agency relationships so as to exempt the consignee from the statutory requirements. A far more effective system is to treat each bill of lading as a separate instance, so that in each case the entity named as consignee is presumptively responsible for demurrage.

---

[13] It is unclear from the opinion whether the railroad sought to assess demurrage charges on all the shipments or only on those in which South Tec was named as the sole consignee.

24

In addition to relying on *South Tec*, Novolog seeks to support its position that it cannot be considered a consignee under the statute (or otherwise) by citing to decisions outside the narrow context of the interpretation of Section 10743(a)(1), which it claims represent "longstanding law barring imposition of demurrage liability upon an entity unilaterally designated as a consignee." This characterization is incorrect. What the cases unanimously require for consignee liability is that the transloader or other transportation intermediary that does not have a beneficial interest in the freight *at least* be named as the consignee in the bill of lading. *See Middle Atl. Conference*, 353 F. Supp. 1109, 1119 n.31 (finding general agreement in the case law that where middlemen such as warehousemen or pier operators (1) acted as known agents or (2) were not named as consignors or consignees, they were not parties to the transportation contract and were not liable for demurrage charges); *CSX Trans., Inc. v. City of Pensacola,* 936 F. Supp. 880, 885 (N.D. Fla. 1995) (relying on the fact that the Port of Pensacola was not listed as a consignee on any of the bills of lading to find it was not liable for demurrage under the railroad's tariff).

On the question whether such a designation is *sufficient* to make the transloader a consignee potentially liable for charges, however, the existing precedent is considerably less clear.

Our decision in *Union Pacific R.R. Co. v. Ametek, Inc.*, 104 F.3d 558 (3d Cir. 1997) (*Ametek*), for instance, has nothing to say about whether a transloader that is named as the consignee might be liable for demurrage charges. That case reached this Court on appeal from the District Court's review of the ICC's decision in *Ametek, Inc. –Petition for Declaratory Order; Ametek, Inc. v. Panther Valley R.R. Corp.*, ICC Docket No. 40663, 1993 ICC Lexis 13 (Jan. 15, 1993) (*ICC Ametek*),

25

where the ICC had held unlawful the attempt by creditors of a certain rail freight carrier to collect demurrage charges from the owner and operator of a plastic processing facility. Ametek "receive[d] raw plastic materials for processing [and after] processing the materials . . . ship[ped] the processed product to the material suppliers' customers." *ICC Ametek* at *4. In the vast majority of the cases, Ametek was not named as the consignee or the consignor on the bills of lading. The ICC, however, also noted that, with respect to a few of the shipments, "Ametek *was a party to the transportation contract by being named as the consignee . . ..*" *Id.* at *17 (emphasis added). Where Ametek was listed as the consignee on the bill of lading, it was potentially liable for the charges. By the time the case reached us, however, the issue of whether it might be liable in the very small number of instances in which Ametek was named as a consignee was no longer being litigated; our review was focused on whether Ametek was liable – either through its receipt of the freight or by some separate contractual arrangement – where it was *not* named as the consignee in the bill of lading. *See id.* at 560 (Ametek "generally was not the consignor or consignee designated on the bills of lading"), 563 (it was "undisputed that Ametek was not a party to the transportation contracts"). We did not even mention, much less take a position on, the ICC's apparent assumption that Ametek *was* a party to the transportation contract in the few cases in which it was named as a consignee. Thus *Ametek* is of no help to Novolog – and indeed, the ICC's position in that litigation supports our view.

*Middle Atlantic Conference* is of no more comfort to Novolog. The court there held that a certain tariff unilaterally expanding the definition of "consignee" to include any person to whom the bill of lading instructed the carrier to deliver the shipment, but specifically explained that the tariff was invalid because it attempted to impose liability on a party who was not

a party to the transportation contract, " *i.e.*, a person *not named in the bills of lading as consignor or consignee.*" *Middle Atl. Conference*, 353 F. Supp. at 1112 (emphasis added). Thus *Middle Atlantic Conference* does not stand for the proposition that a tariff may not make such entities as warehousemen liable for demurrage charges, but that it may not do so without support from the bill of lading and simply because of the "mere fact of handling the goods shipped." *Id.* at 1118.

The "longstanding law" invoked by Novolog for the proposition that a transloader cannot be considered a consignee for demurrage purposes where it has not executed the bill of lading that names it as the consignee is, in fact, limited to three federal district court cases. *See CSX Transp., Inc. v. Port Erie Plastics, Inc.*, No. 05-139 Erie, 2006 WL 2847414 (W.D. Pa. Sep. 29, 2006) (following the District Court's decision in this case); *Union Pacific Railroad Co. v. Carry Transit*, No.3:04-CV-1095-B (N.D. Tex. Oct. 27, 2005) (holding that where a transloader did not have any beneficial interest in the freight and did not authorize the shippers to list it as a consignee it could not be held liable for demurrage charges); and *Southern Pacific Transp. Co. v. Matson Navigation Co.*, 383 F. Supp. 154, 157 (D. Cal. 1974) (holding that a transloader who is "merely named in the railroad bill of lading" without being actively involved in the transportation contract and without any "culpability for the delay" cannot be liable for demurrage, but noting specifically that the transloader had been named as the "care of" party in the vast majority of the bills of lading under examination). We do not find these cases persuasive.[14]

_____

[14] Novolog also urges us to consider *Evans Prods. Co. v. Interstate Commerce Comm'n*, 729 F.2d 1107, 1113 (7th Cir. 1984). *Evans* involved an attempt to assess demurrage charges against repair facilities; the court there concluded, among other things, that "[a]lthough they receive cars and ship the repaired

For these reasons we hold that an entity named on a bill of lading as the sole consignee, without any designations clearly indicating any other role, is presumptively liable for demurrage fees on the shipment to which that bill of lading refers, but may avoid liability, if it is an agent, by following the notification provisions of 49 U.S.C. § 10743(a)(1). On remand, the District Court should determine whether Novolog appeared as the consignee on the relevant bills of lading. Because it is undisputed that Novolog did not comply with the statutory notification provision, it will be unnecessary to determine whether it acted as an agent in the instances where it was named as the consignee.

## C. Liability for demurrage charges of a named shipper or consignor

The final issue in this case is whether CSX may assess demurrage charges against Novolog as the consignor for the instances in which Novolog ordered empty railcars, which it then loaded with freight for CSX to transport to a domestic

---

cars out again, repair facilities are not consignors or consignees of the cars because delivery of the cars as freight is not completed and the carrier's lien is not extinguished when the repair facility receives the car. Repair facilities do not determine the further disposition of the cars, but rather act at the behest of the car owners/lessors." *Id.* at 1113. It is unclear under what travel documents the empty rail cars traveled on their way to the repair facilities; the court appears to have based its decision on the common-sense notion that a rail car is not going to a repair facility to stay there, but rather will be released to its owner or lessee after some time. We do not find the analogy between a transloader and a repair facility – which presumably does not engage in loading or unloading operations and cannot be the consignee of freight – particularly instructive.

28

destination. CSX seeks to assess demurrage under Item 8070(G) of its tariff, which provides that "[u]nless otherwise advised, in WRITING, that another party is willing to accept responsibility for demurrage, consignor at origin or consignee at destination will be responsible for the payment of demurrage charges" (emphasis in original). CSX's tariff defines "consignor" as "[t]he party in whose name a car[s] is ordered; or the party who furnishes forwarding direction."

During the summary judgment proceedings, CSX introduced disputed evidence that Novolog appeared as the consignor on a number of bills of lading for such shipments. The District Court, however, made no findings of fact related to Novolog's consignor status and did not discuss this issue separately in its opinion. Nor did the parties fully brief this issue on appeal.

Although consignor liability is not regulated by 49 U.S.C. § 10743 or an analogous statutory provision, we see no reason why the principles applicable to consignee liability under the statute should not be made equally applicable to consignor liability. If the analogous rule governed, the entity named as consignor or shipper on the bill of lading would be liable unless it had ordered the empty railcars as an agent of another and had so notified the carrier in writing at the time of the request or unless, if another entity had designated it as consignor, it notified the carrier prior to shipment. Nonetheless, we find the record insufficient and the briefing too cursory to announce a rule. We will instead vacate the District Court's grant of summary judgment with respect to the claims based on consignor liability and instruct it to reexamine this issue in light of our discussion of consignee liability. On remand, the District Court should determine whether Novolog appeared as the shipper/consignor on the relevant bills of lading. The District Court may also find it necessary to determine whether Novolog

29

was an agent in the instances in which it appeared as shipper or consignor in the bills of lading and, if so, whether it appropriately notified CSX of the relationship.

## IV. **Conclusion**

For the reasons stated above, we will **vacate** the District Court's order granting judgment as a matter of law in favor of Novolog and we will **remand** this case to the District Court for further proceedings consistent with this opinion.