In the

# United States Court of Appeals

### For the Seventh Circuit

No. 17-2343

WISCONSIN CENTRAL LIMITED,

*Plaintiff-Appellee,*

*v.*

TIENERGY, LLC,

*Defendant / Third Party*
*Plaintiff-Appellant,*

*v.*

ALLIED TRACK SERVICES, INC.,

*Third Party*
*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-02489 — **Amy J. St. Eve**, *Judge.*

ARGUED JANUARY 11, 2018 — DECIDED JULY 3, 2018

Before EASTERBROOK and BARRETT, *Circuit Judges*, and
STADTMUELLER, *District Judge*.[*]

BARRETT, *Circuit Judge*. Demurrage is a charge that rail
carriers are statutorily required to impose when rail cars are
detained beyond the time the tariff allows for loading or un-
loading. It serves two functions: it secures the rail carrier
compensation for the use of the car, and it serves the public's
interest in making the cars available to transport other prop-
erty. The sooner a car is back in service, the sooner it is
available to move the property of others.

This case involves demurrage that accrued when rail cars
belonging to Wisconsin Central were detained at TiEnergy's
facility after delivering a load of railroad ties. Wisconsin
Central sued TiEnergy to recover the charges, asserting that
TiEnergy was liable for them as consignee of the goods.
TiEnergy argued that it had not agreed to be the consignee;
it maintained that Allied, the company that shipped the ties,
should foot the bill. The district court held TiEnergy respon-
sible, and we affirm its judgment.

I.

Allied Track Services, Inc. entered into two agreements to
facilitate the shipment of approximately 100,000 railroad ties.
It contracted with Wisconsin Central Limited's parent com-
pany, Canadian National Railway, to have Wisconsin Cen-
tral ship the ties to TiEnergy, LLC's facility in Wisconsin.
That contract incorporated CN Tariff 9000, which provided
that demurrage would begin to accrue on the cars after two
days of unloading time. Wisconsin Central also entered into

---

[*] Of the Eastern District of Wisconsin, sitting by designation.

an oral agreement with TiEnergy, which is in the business of processing and disposing of used railroad ties. TiEnergy agreed to receive the ties at its Wisconsin facility, where it would grind them. It would then sell the ties to Xcel Energy, which would burn them to generate power. When the pro- cess was complete, TiEnergy would provide Allied with proof that the ties had been incinerated in an environmental- ly safe manner.

Allied listed TiEnergy as the consignee of the railroad ties on all relevant bills of lading, and the ties were shipped to TiEnergy's Wisconsin facility. After receiving the ties, TiEnergy went forward with its plan: it unloaded, ground, and sold them to Xcel Energy. The approximately 100 rail cars used to ship the ties, however, remained on the track and sidetrack beyond the two-day unloading period permitted by the tariff. Daily demurrage charges started to accrue on each car.

Canadian National began billing TiEnergy for the demurrage. When it received the invoices, TiEnergy contacted both Canadian National and Allied to object. TiEnergy said that it had not agreed to be identified as the consignee on the bills of lading and that it thus could not be held responsible for demurrage. In the meantime, the cars remained on TiEnergy's track, and the demurrage charges continued to climb.

Wisconsin Central sued TiEnergy, seeking to recover approximately $100,000 in demurrage. TiEnergy filed a third-party complaint against Allied seeking indemnification or contribution. A flurry of motions followed the close of discovery: Wisconsin Central filed a motion for summary judgment against TiEnergy, TiEnergy filed a cross-motion

for summary judgment against Wisconsin Central, and Allied filed a motion for summary judgment against TiEnergy. In its opinion, the district court granted the motions filed by Wisconsin Central and Allied; it denied the one filed by TiEnergy. TiEnergy appeals the district court's grants of summary judgment in favor of Wisconsin Central and Allied.[1]

## II.

Before we turn to the merits, we have two jurisdictional matters to address. The first concerns appellate jurisdiction. TiEnergy invoked our jurisdiction under 28 U.S.C. § 1291, which gives us "jurisdiction of appeals from all final decisions of the district courts of the United States." To make the entry of final judgment clear, Federal Rule of Civil Procedure 58(a) provides that "[e]very judgment and amended judgment must be set out in a separate document." While the district court docketed a Rule 58 judgment order reflecting its final disposition of the claims brought by Wisconsin Central against TiEnergy, it did not do so for the third-party claim that TiEnergy asserted against Allied. Because a judg-

---

[1] One of TiEnergy's complaints on appeal is that the district court improperly considered facts submitted by Wisconsin Central in violation of Northern District of Illinois Local Rule 56.1, which governs the procedures that parties must follow in making and opposing summary judgment motions. If the district court had not considered these facts, TiEnergy says, it would have been entitled to summary judgment. We review a district court's decisions regarding litigants' compliance with local rules for abuse of discretion, *see Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006), and we find no abuse in the district court's conclusion that Wisconsin Central's response to TiEnergy's Local Rule 56.1(b)(3)(C) statement was properly filed. *Wisconsin Central, Ltd. v. TiEnergy, LLC*, No. 15 C 2489, 2017 WL 1427065 (N.D. Ill. Apr. 21, 2017).

ment is not final for purposes of § 1291 until it disposes of all claims in the suit, *General Insurance Co. of America v. Clark Mall Corp.*, 644 F.3d 375, 379 (7th Cir. 2011), the absence of the Rule 58 judgment order disposing of TiEnergy's third-party claim creates some uncertainty about our appellate jurisdiction.

We asked the parties to address this issue in supplemental briefing. They contend—and we agree—that although the district court failed to issue a separate judgment disposing of all the claims, it clearly signaled in its opinion that it was finished with the case. Rule 58's "separate document" requirement is important because it keeps jurisdictional lines clear. We have said, however, that a district court's failure to comply with the formal requirement is not fatal to our jurisdiction if the district court has otherwise indicated its intent to finally dispose of all claims. *Borrero v. City of Chicago*, 456 F.3d 698, 699–700 (7th Cir. 2006). The district court did so here. *See Wisconsin Cent., Ltd. v. TiEnergy, LLC*, No. 15 C 2489, 2017 WL 1427065 (N.D. Ill. Apr. 21, 2017).

The second matter—and one on which we also ordered supplemental briefing—concerns original jurisdiction. Because this case focuses on the bill of lading, which is the shipping contract between the parties, it sounds like a breach-of-contract claim. But if this case is simply a contract dispute, we probably lack jurisdiction over it. Contract claims arise under state law, so they typically require diversity jurisdiction, and both Wisconsin Central and TiEnergy are citizens of Illinois. 28 U.S.C. § 1332; *see also Strawbridge v. Curtiss*, 7 U.S. 267 (1806) (holding that the diversity statute requires that the citizenship of all plaintiffs be different from

the citizenship of all defendants). In an exceptional circum- stance, the presence of a federal issue can transform a state- law claim into one that arises under federal law. *See Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufactur- ing*, 545 U.S. 308 (2005) (holding that a state cause of action arises under federal law if, among other things, it requires resolution of a substantial and contested federal issue). There might be an argument for that here, but Wisconsin Central has not made it.[2]

Rather than asserting a contract claim that nonetheless arises under federal law, Wisconsin Central's complaint sought to recover demurrage pursuant to a provision of the Interstate Commerce Commission Termination Act that assigns liability for the payment of transportation rates. 49

U.S.C. § 10743. Demurrage charges have long been treated as "rates for transportation" under that provision, *see CSX Transportation Co. v. Novolog Bucks County*, 502 F.3d 247, 256–

---

[2] This case involves the Interstate Commerce Commission Termination Act, which succeeded the Interstate Commerce Act. When the Interstate Commerce Act was in effect, the Supreme Court held that an action to collect shipping charges, which was an action for breach of contract, presented a federal question arising under it. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534 (1983); *Louisville & Nashville R.R. Co. v. Rice*, 247 U.S. 201 (1918); *see also Kansas City Terminal Ry. Co. v. Jordan Mfg. Co.*, 750 F.2d 551 (7th Cir. 1984). We applied this reasoning to a suit seeking the collection of demurrage charges under that statute. *Atchison, T. & S.F. Ry. Co. v. Springer*, 172 F.2d 346 (7th Cir. 1949). Neither Wisconsin Central's complaint nor its supplemental brief frames its claim as a state contract claim that presents a substantial and contested issue of federal law under the Interstate Commerce Commission Termination Act. Thus, we need not confront the question whether a claim for failure to pay demurrage fees required by the shipping contract arises under the statute currently in force.

57 (3rd Cir. 2007) (interpreting and recounting the history of the phrase), and consignees are presumptively liable for it. Section 10743(c) grants rail carriers a cause of action to enforce that liability, and Wisconsin Central has invoked that grant here. A cause of action arises under the law that created it, *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916), which means that this case arises under federal law. Jurisdiction exists pursuant to 28 U.S.C. § 1337(a), which grants jurisdiction over "any civil action or proceeding arising under any Act of Congress regulating commerce."

In its supplemental brief, TiEnergy contends that § 1337(a) carries an amount-in-controversy requirement that deprives us of jurisdiction. That provision limits federal jurisdiction over cases filed under 49 U.S.C. § 11706 or 49 U.S.C. § 14706 when the "matter in controversy for each receipt or bill of lading exceeds $10,000." TiEnergy says that this limit applies, because the demurrage charges sought by Wisconsin Central include numerous invoices for less than $10,000.

This argument is frivolous. Section 1337(a)'s amount-in-controversy limitation is plainly applicable only to cases filed under 49 U.S.C. § 11706 or 49 U.S.C. § 14706, and Wisconsin Central brought this action pursuant to 49 U.S.C. § 10743. Moreover, the causes of action that § 1337 limits—those brought under § 11706 or § 14706—involve actions brought *against*, not *by* rail carriers. This suit presents a federal question over which we have jurisdiction, and nothing in § 1337(a) changes that.

III.

Section 10743 codifies the common-law rule that the con-signee of freight is presumptively liable for demurrage ac-crued at the destination. *Illinois Cent. R.R. Co. v. South Tec Dev. Warehouse, Inc.*, 337 F.3d 813, 820 (7th Cir. 2003) (ex-plaining that in the absence of a contract providing other-wise, only a consignee is liable for demurrage). Given this presumption, the parties agree that TiEnergy's liability for demurrage turns on whether it is a "consignee" for purposes of § 10743. The tricky thing is that being a consignee under 10743 requires more than mere custody of the freight. *Cf.* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "consign-ee" to mean "[o]ne to whom goods are consigned" and "consign" to mean "transfer to another's custody or charge"). We consider other factors as well: whether the par-ty agreed by contract to consignee status, whether the party was designated as consignee in the bill of lading, and the na-ture of the party's relationship to the freight. *South Tec*, 337 F.3d at 820–22.

In denying that it was the consignee of the railroad ties, TiEnergy emphasizes that it neither agreed to nor knew about its designation as consignee on the bill of lading. That is its best fact, because being unilaterally designated as the consignee on the bill of lading is not enough to render a re-cipient of freight liable for demurrage. *South Tec*, 337 F.3d at 821.[3] At the same time, this fact does not get TiEnergy off the

---

[3] There is a circuit split on this question. The Third Circuit has held that a recipient named as consignee in the bill of lading is liable for de-murrage regardless of whether it agreed to be designated as consignee. *CSX Transp. Co. v. Novolog Bucks Cty.*, 502 F.3d 247 (3rd Cir. 2007). The Eleventh Circuit, in contrast, has said that unilateral designation as con-

hook, because even a unilaterally designated party can be liable for demurrage when other factors are present reflecting an interest in or control of the goods. *Id*. This test is designed to separate intermediaries like warehouses and transloaders from recipients who have a legal or beneficial ownership interest in the freight. Those who merely handle the freight are not consignees; those with a relationship to it have that status.

---

signee on a bill of lading is not enough to confer consignee status; a recipient of the freight is not liable for demurrage unless it consented to or at least had notice of the designation. *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1282 (11th Cir. 2009). We have not squarely addressed the issue, but the position we have expressed in dicta is closer to the Eleventh Circuit's than the Third Circuit's. *See South Tec*, 337 F.3d at 820–21. Because of this split in authority, the Surface Transportation Board has promulgated the following regulation governing demurrage liability:

> Any person receiving rail cars from a carrier for loading or unloading who detains the cars beyond the period of free time set forth in the governing demurrage tariff may be held liable for demurrage if the carrier has provided that person with actual notice of the demurrage tariff providing for such liability prior to the placement of the rail cars.

49 C.F.R. § 1333.3. In the course of its rulemaking proceedings, the Board concluded that demurrage is not part of the "rates for transportation" governed by § 10743. *Demurrage Liability*, *Final Rule*, 2014 WL 1399404 (April 9, 2014) (asserting that "49 U.S.C. § 10743 … appl[ies] to carriers' line-haul rates, but not to demurrage charges."). The new rule does not apply here, because it took effect on July 15, 2014, and the demurrage on Wisconsin Central's cars accrued in November 2013. And the parties have not asked us to overrule our precedent treating demurrage as part of the "rates for transportation" under § 10743. *See South Tec*, 337 F.3d at 817. Thus, we do not address either the rule or the soundness of the Board's interpretation of the statute.

TiEnergy denies that it had any interest in or control of the railroad ties delivered by the detained railcars. According to TiEnergy, it was an intermediary like a warehouse or transloader. It received ties belonging to Allied and—acting solely on Allied's behalf—forwarded them to Xcel for incineration. Like other intermediaries relieved of liability for demurrage, TiEnergy says that it acted merely as an agent with no interest of its own in the goods.

Classifying TiEnergy as an intermediary jams a square peg into a round hole. To begin with, TiEnergy is not in the freight-transfer or cargo-storage business. It is in the business of processing and disposing of used railroad ties. That distinguishes TiEnergy from the entities that present the hard cases for demurrage liability—warehousemen, pier operators, transloaders, and connecting carriers. *See CSX Transp. Co. v. Novalog Bucks Cty.*, 502 F.3d 247, 250 (3d Cir. 2007). Unlike these entities, TiEnergy is not an intermediary indifferent to freight that it stores or transfers from one mode of transportation to the next. It agrees to take railroad ties so that it can use them—as it did when the ties from Allied arrived at its facility. TiEnergy ground the ties, thereby exhibiting its control of them. And it sold the ties to Xcel, thereby demonstrating that it enjoyed their benefit. TiEnergy's claim that it functioned solely as Allied's agent in selling the ties to Xcel Energy for incineration is belied by the fact that it kept the full payment for itself.[4]

---

[4] The claim that TiEnergy functioned as Allied's agent is also belied by the fact that Allied offered to help TiEnergy move the cars off the track, but was unable to do so because TiEnergy did not authorize it.

The only conclusion a juror could reasonably draw from these undisputed facts is that TiEnergy had both control of and an interest in the ties. And under *South Tec*, that means that it had consignee status. 337 F.3d at 820–22. Consignees are liable for demurrage; thus, TiEnergy owes Wisconsin Central the fees accrued for the detained rail cars.[5]

It is worth noting that if TiEnergy had been a consignee functioning only as Allied's agent, the statute offered it a way out of liability for transportation rates. Under § 10743(a)(1), a "consignee that is an agent only, not having beneficial title to the property" has an option that other consignees do not: it can give the carrier written notice that it lacks beneficial title and the name and address of the person who does. If the agent takes that step, it escapes liability for "additional rates that may be found to be due after delivery." § 10743(a)(1). Demurrage accrues after delivery, so an agent-consignee who invokes this exception does not have to pay it. TiEnergy, however, did not invoke this exception. It thus remains subject to the default rule that consignees must pay when rail cars delivering shipments are detained longer than the time the tariff allows.

## IV.

TiEnergy insists that if it is found liable for the demurrage charges, it is entitled to either indemnification or con-

---

[5] TiEnergy argued in the district court that weather conditions prevented it from releasing the cars. The district court treated that argument as waived "because TiEnergy did not develop this argument or support it with any legal authority." TiEnergy's one-sentence assertion that "this finding was directly contrary to the record" is not reason for us to disturb the district court's finding.

tribution from Allied. Indemnification shifts the entire loss to the other party, while contribution distributes it among multiple parties. Both remedies look to fault when distributing loss. *See Schulson v. D'Ancona & Pflaum LLC*, 821 N.E.2d 643, 647 (Ill. App. Ct. 2004).[6]

TiEnergy concedes that no written contract obligated Allied to indemnify it for any demurrage liability it incurred. (In fact, the parties had no written contract memorializing any of the details of their agreement.) Because it nonetheless asserts that Allied breached its agreement to assume responsibility for demurrage, it is presumably claiming that Allied and TiEnergy entered an oral contract regarding indemnity. It points to no evidence, however, supporting this assertion. TiEnergy's breach-of-contract claim therefore fails.

TiEnergy also argues that Allied must indemnify it because of an alleged agency relationship between the two. This argument fails for several reasons, but we can stop with this basic point: TiEnergy was not Allied's agent. A hallmark of the principal/agent relationship is the principal's right to control the conduct of the agent. *See Wilson v. Edward Hosp.*, 981 N.E.2d 971, 978 (Ill. 2012). It is undisputed that Allied exercised no control over the manner in which TiEnergy disposed of the ties; nor, as we have already said, did TiEnergy sell them to Xcel on Allied's behalf.

TiEnergy's claim for contribution in tort fares no better. This argument relies on the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2, which—as its name suggests—

---

[6] The parties do not explicitly address the choice-of-law issue, but they both assume that Illinois law applies to the indemnification and contribution claims.

permits one joint tortfeasor to seek contribution from another. Yet TiEnergy has not even tried to make the case that Wisconsin Central's claim for demurrage sounds in tort. *Cf. Guerino v. Depot Place P'ship*, 730 N.E.2d 1094, 1099 (Ill. 2000) (holding that there is no claim under the Act when liability is predicated on a contract). Moreover, as the district court observed, Allied is not liable to Wisconsin Central for the demurrage; so even if this is a tort, there is no joint tortfeasor from whom to collect. The Act is wholly inapplicable.

\* \* \*

The district court correctly held that TiEnergy must pay Wisconsin Central the demurrage fees. Its judgment is AFFIRMED.